The mother, Allyson Beall Carroll, and the father, Sidney Mark Carroll, were married in January 1996. The parties separated on October 15, 1998; one child was born of the marriage in April 1999. On June 28, 1999, the mother filed for a divorce, citing incompatibility of temperament and an irretrievable breakdown of the marriage as grounds for the divorce. She requested, among other things, custody of the parties' child and child support. The father answered and counterclaimed, requesting, among other things, that the parties be awarded joint custody of the child. On April 25, 2000, the court, after ore tenus proceedings, entered a final judgment of divorce, awarding the parties joint custody of the child, with the mother maintaining primary physical custody and having "full, complete and final control concerning [the] child and [making] all decisions regarding all issues relating to rearing, health, welfare and well-being of [the] child." The court awarded the father extensive visitation and involvement in the child's activities, and it ordered him to pay child support and child-care/nanny expenses. The order contained no provision restricting the location of the mother's residence.
On January 19, 2001, the father petitioned to modify the joint-custody provision, alleging that there had been a material change in circumstances. He requested that the child's living arrangements be changed so that the child would be reared by him rather than by the nanny; that the portion of the divorce judgment awarding the mother full and complete control over the child be deleted; and that reasonable and adequate notice be required to be given if either parent decided to move out of the Birmingham metropolitan area, with the relocating parent bearing the cost of extraordinary visitation expenses incurred by the nonrelocating parent. The mother moved to dismiss the father's petition. The court denied the mother's motion to dismiss. The mother then moved for reconsideration of her motion to dismiss, alleging that the father had not demonstrated a material change in circumstances upon which a custody modification could be granted. Following an ore tenus hearing, the court, on May 3, 2001, denied the mother's motion for reconsideration.
On October 22, 2001, the father amended his petition to modify and requested that the court schedule a clear and workable schedule for his telephone contact with the child; that the court require the mother to notify the father of her intention to take the child outside of the Birmingham metropolitan area; and that the court require the mother to furnish a copy of her work schedule before the first day of each month. On December 18, 2001, the court entered a consent order modifying the final judgment of divorce, in part, by increasing and clarifying the father's visitation periods. *Page 698 
On October 31, 2002, the father again petitioned to modify the divorce judgment. He alleged that there had been a material change in circumstances — namely that the nanny had resigned and the child no longer required the services of a nanny — that warranted the elimination of his monthly obligation for child-care/nanny expenses. In late January or early February 2003, the mother notified the father of her intent to relocate to her hometown of Luverne. On February 10, 2003, the father filed an emergency motion to restrain the mother from moving with the child from Birmingham to Luverne, alleging that if the mother moved the child to Luverne he would be prevented from having "close and frequent contact" with the child. He also alleged that he would have extreme difficulty exercising visitation because of the "hostile and restrictive" environment created by the child's maternal grandparents and the Luverne Police Department. The mother answered the father's October 31, 2002, petition to modify and counterpetitioned, alleging that the father's petition was unfounded because no material change in circumstances had occurred; she requested an attorney fee. On February 13, 2003, the mother responded to the father's emergency motion. She contended that the parties' visitation and custodial schedules would not be altered by her relocation; however, she volunteered to rearrange the weekday visitation, as long as it did not interfere with the child's school attendance.[1] She further stated that although Luverne was located approximately 130 miles from Birmingham, the father, who is a licensed commercial pilot who owned a private plane, would not be deprived of visitation because he could fly to Luverne within 30 minutes or drive there within 2 hours. She further stated that she had previously accommodated the father's scheduling conflicts previously by permitting him more visitation and that she intended to continue to do so after the move, if necessary. Finally, she stated that her intent to relocate to her parents' home upon her return to Luverne was a temporary arrangement until she could procure permanent living arrangements for herself and the child. On March 10, 2003, the father filed an amendment to his October 31, 2002, petition to modify, requesting that the court make him the primary physical custodian of the child and reiterating his request that the mother be prohibited from moving outside the Birmingham metropolitan area. On March 12, 2003, the father petitioned for a rule nisi, requesting that the court require the mother to appear and show cause why she should not be held in contempt for allegedly violating the court's oral order to maintain the status quo by enrolling the parties' child in a school in Luverne. On March 13, 2003, the mother denied the allegations in the father's petition for a rule nisi. Following ore tenus proceedings, the court, on April 3, 2003, entered an order denying the father's petition for a rule nisi and his October 31, 2002, petition to modify custody but granting the father's emergency motion. In modifying its April 2000 divorce judgment, the court "prohibited [the mother] from moving from the Birmingham area to Luverne, or elsewhere, without consent of [the father] or prior court order." Both parties subsequently filed Rule 59, Ala. R. Civ. P., motions to alter, amend, or vacate the judgment. On May 13, 2003, the court entered an order denying those motions. The mother appeals.[2] *Page 699 
"The ore tenus rule is applicable to child-custody-modification proceedings, and the court's judgment based on its findings of fact will not be reversed absent a showing that the findings are plainly and palpably wrong." E.M.C. v. K.C.Y., 735 So.2d 1225,1228 (Ala.Civ.App. 1999).
This court has established the following standards of proof in custody-modification actions:
 "`Where the parties agree to joint legal custody and shared physical custody of the children without a judicial determination preferring either parent, "custody [is] appropriately determined by the trial court according to what [is] in the `best interest' of the children." Ex parte Couch, 521 So.2d 987, 989 (Ala. 1988). However, where the parents have joint legal custody, but a previous judicial determination grants primary custody to one parent and secondary custody to the other, "the trial court [is] correct in applying the [Ex parte] McLendon [, 455 So.2d 863 (Ala. 1984),] standard and requiring the [parent] to show that a change in custody would materially promote the welfare and best interests of the child, offsetting the disruptive effect of uprooting the child." Blackmon v. Scott, 622 So.2d 393, 394 (Ala.Civ.App. 1993).'"
Hoplamazian v. Hoplamazian, 740 So.2d 1100, 1102 (Ala.Civ.App. 1999).
The mother argues that the trial court abused its discretion in modifying the divorce judgment and imposing a geographical limitation on her residence. The mother, relying on Cheatham v.Cheatham, 344 So.2d 525 (Ala.Civ.App. 1977), argues that the father failed to demonstrate that a substantial change in circumstances had occurred to justify a modification of the divorce judgment. In particular, the mother contends that the father failed to demonstrate that her "alleged change in circumstances" (i.e., her proposed relocation to Luverne) would interfere with his ability to visit with the party's child or would adversely affect the child.
In Cheatham, this court found that the imposition of a geographical restriction in a custody-modification case was unwarranted because the father, the noncustodial parent, had failed to demonstrate that a material change in circumstances had occurred to justify modification of the divorce judgment or that the mother's relocation to Colorado had had an adverse affect on the child. Additionally, we noted that, in regard to relocation, "[a] parent entrusted with the custody of a child has the right, if not restricted by the court, to remove the child from the jurisdiction of the court granting custody." 344 So.2d at 527.
In his brief to this court, the father concedes that he did not demonstrate at trial that a material change in circumstances had occurred that would warrant a modification of custody pursuant toEx parte McLendon, 455 So.2d 863 (Ala. 1984). However, he maintains that the court had the discretion to impose a geographical restriction on the mother's residence because it was in the best interest of the parties' child.
In Godwin v. Balderamos, 876 So.2d 1169, 1172-73
(Ala.Civ.App. 2003), this court stated:
 "In Murphy [v. Murphy, 479 So.2d 1261 (Ala.Civ.App. 1985),] this court noted that a parent requesting a change of custody from one parent to the other must meet the Ex parte McLendon standard. Id. at 1263. However, this *Page 700 
court further explained that the issue at hand was not a change of custody, but instead an approval of a change of residence proposed by the custodial parent. Id. Thus, this court concluded that the trial court correctly granted the mother permission to relocate because `under these facts, the trial court should be guided by the best interests of the child.' Id."
In applying the best-interest standard to the trial court's restriction on the custodial parent's relocation, we note that other than the mother's proposed relocation to Luverne the father had no complaints about the mother's ability to properly care for the child. He argues that the imposition of the geographical restriction on the mother's residence was necessary to ensure that he continued to enjoy "frequent and close" contact with the parties' child.[3] He contends that if the mother were permitted to relocate to Luverne, he would likely not exercise such visitation for two reasons: 1) the distance from Birmingham to Luverne and the cost of accommodations while conducting visitation; and 2) the "hostile environment" of the maternal grandparents' home, the place the mother intended to reside temporarily upon her return to Luverne.
The record reflects that the father was interested and involved in the child's life. He argued that relocation would impair his ability to visit with the child because he would have to endure a five-hour round-trip drive between Birmingham and Luverne in order to exercise bi-monthly, weekend visitation. He further argued that he would have to endure the same five-hour round-trip drive and incur lodging expenses in Luverne in order to exercise a four-hour block of visitation for up to three days a week while the mother was out of town on business.
Despite the father's contentions regarding the distance he would be forced to travel and the expenses he would incur as a result of the mother's relocation, the record suggests that his visitation with the parties' child could continue, given his flexible work schedule and financial resources. The father, a licensed, commercial airline pilot, testified that he was so highly ranked within the company that he could select his days to work. In fact, he stated that he typically had from 17-20 days off per month. Additionally, the record indicates that the father earned approximately $203,095.31 in 2002.[4] Based on the record, we cannot conclude that the distance from Birmingham to Luverne and the visitation-related lodging expenses the father would incur in exercising his visitation would serve to deprive the father of his court-ordered visitation with the child.
Further, the record indicates that the father had previously conducted visitation *Page 701 
with the child by traveling to Luverne after the mother initially relocated there in January 2000. After the parties separated, the mother and the child remained in the marital home in Birmingham. However, in December 1999, the mother received a letter from the father indicating that she should pay him for remaining in the marital home. The mother, who was still on maternity leave and without income, relocated to her parents' home in Luverne in January 2000, where she remained with the child until the divorce was final in April 2000. During this period, the father visited the child approximately six times, twice by flying his private airplane from Birmingham and the other times by driving his automobile. Although the father contended at the trial that he had sold his airplane to one of his sisters and that he could no longer use it "at will," the record indicates that other pilots still used the airplane, that the airplane was still located at the father's private airstrip, and that the airplane was still registered in the father's name.[5]
The father also testified that the "hostile environment" of the maternal grandparents' home, the place the mother intended to reside temporarily upon her return to Luverne, would inhibit his ability to conduct visitation with the child. The father stated that the maternal grandmother had made disparaging remarks about him on three occasions when he had traveled to their home to visit the child during the original divorce proceedings. On one of those occasions, the father stated that the chief of police of Luverne came to the home and warned him that he would have to "behave" while he was in Luverne. However, the father admitted that he and the maternal grandparents were never involved in a fight; that the maternal grandfather had diffused an unpleasant situation on at least two or three occasions; that the father had also been "pretty upset" during one of the visits; that the maternal grandfather had offered to pick him up at the airport, even offering to leave a car at the airport; and that those events occurred during the original divorce proceedings. The father essentially presented no evidence of any "hostility" in connection with the maternal grandparents after the parties had divorced. Even if the father were to encounter the aforementioned "problems" in carrying out visitation, those factors alone are an insufficient basis upon which the trial court could have modified visitation.
Alternatively, the father argues that the trial court could have imposed a geographical restriction on the mother's residence based on evidence presented at trial that indicated: 1) that the relocation was unnecessary and was either one of the mother's many unnecessary moves or a result of her ending her relationship with her boyfriend; 2) that the move was not in good faith, but was a means to thwart the relationship between him and the parties' child; and 3) that the child had substantial existing contacts in Birmingham, including family, school, and dance classes.
The mother stated that although she had lived in Birmingham for approximately 18 years, she had been unhappy living there for an extended period of time and desired to relocate to her hometown of Luverne. She stated that she desired to return to Luverne in order to spend more time with the child, by altering her schedule and ultimately changing professions. *Page 702 
The mother, who was a licensed dental hygienist as well as a flight attendant, planned to return to work as a hygienist three days per week and to fly on the weekends when the father had visitation. The mother stated that she had interviewed and had possibly procured employment as a dental hygienist in Luverne. The mother also stated that relocating to Luverne would allow her to spend more time at home with the child and would afford the child the opportunity to be near her only living grandparents. She said that she and the child had usually visited Luverne every 4-5 weeks for 4-10 days at a time. The mother testified that Luverne was a small town with a low crime rate and a "great" school system and that the child had acquired friends there. The mother denied that she was relocating because she had broken up with her boyfriend of two years in December 2002. She contended that the breakup was merely coincidental to her desire to relocate. The father contends that "testimony concerning the mother's history of multiple moves with the minor child could have been considered in determining whether to allow the mother to move, yet again, with the child." We find this argument to be without merit. The record indicates that the mother had relocated three times since the child's birth, once as a result of the father's request for rent in order for her and the child to remain in the marital home after the parties' separation. After the divorce, the mother and the child moved to an apartment in Birmingham, where they remained for approximately one year. The mother then purchased a townhouse in Birmingham where she resided at the time of the hearing. None of those moves evidences a "history of multiple moves" warranting a restriction on the mother's right to relocate, as the father contends.
The father has three siblings, only one of whom lives in the Birmingham metropolitan area. The record suggests that only the paternal aunt had more than marginal contact with the child. Further, the father's contention that the child would be deprived of the familiarity of day care and dance classes is without merit. The record shows that the mother has enrolled the child in comparable programs in Luverne.
The mother also stated that she never attempted to deprive the father of visitation with the child. She stated that she had kept the father informed of the child's doctor appointments and activities, including giving him a monthly calendar of the child's events. The record also indicates that from September 2002 through February 2003 the father did not regularly exercise visitation with the child when the mother was out of town. Additionally, the record shows that the mother had accommodated the father by altering the visitation schedule so that the father received his allotted amount of visitation as well as additional visitation; she had even driven to Montgomery on two occasions to facilitate visitation.
The trial court abused its discretion when it determined that it would be in the child's best interest that the mother and child be "prohibited from moving from the Birmingham area to Luverne, or elsewhere" under the particular facts of this case. Accordingly, we reverse the judgment of the trial court and remand this case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN, J., concurs in the result, without writing.
MURDOCK, J., concurs in the result, with writing.
CRAWLEY, J., dissents, without writing.
THOMPSON, J., dissents, with writing.
[1] As part of the mother's plan to relocate, the child was enrolled in a preschool in Luverne that required that the child attend on Mondays, Wednesdays, and Fridays.
[2] The Alabama Parent-Child Relationship Protection Act, §30-3-160 et seq., Ala. Code 1975, is inapplicable in this matter because all litigation had ceased before September 1, 2003, the date the Act became effective.
[3] Pursuant to the December 2001 modification of the divorce judgment, the father was permitted visitation two Sundays per month from 8:00 a.m. to 6:00 p.m., and for two hours each day the mother was out of town on business. However, after the child reached the age of three, he was permitted visitation during two full weekends a month; that weekend visitation began on Friday at 6:00 p.m. and ended on Sunday at 6:00 p.m. After the child reached the age of three, he was also permitted four hours of visitation per day for up to three days when the mother was out of town on business. The father testified that he had missed weekly visitation on only three occasions because of scheduling conflicts.
[4] The father testified that he had earned approximately $17,500 per month in 2002, but that he had taken a 29% pay cut because of the company's financial difficulties. He stated that this resulted in his earning approximately $12,500 per month. However, the father's February 16, 2003, pay stub indicates that he had earned $28,037.24 since January 1, 2003, $13,566.59 of which he earned during the period ending January 30, 2003.
[5] The record indicates that the father had agreed to sell the airplane to his sister for $55,000 in cash and that they had apparently signed a bill of sale for the airplane on December 15, 2002. However, the sister did not pay the father the $55,000 until January or February 2003. *Page 703