3 So.3d 221 (2008)
Lisa M. MEADOWS
v.
Christopher G. MEADOWS.
2060309.
Court of Civil Appeals of Alabama.
August 15, 2008.
*222 Albert L. Jordan and R. Dale Wallace, Jr., of Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, for appellant.
Jim Pino of Jim Pino & Associates, P.C., Pelham, for appellee.
THOMAS, Judge.
Lisa M. Meadows ("the mother") and Christopher G. Meadows ("the father") were married in September 2000. The parties first met while the mother was enrolled in optometry school at the University of Alabama at Birmingham. After their marriage, the parties lived in South Carolina. The mother was employed as an optometrist; the father was a pilot, originally for another company, and then for United Parcel Service ("UPS"). In August 2002, the parties moved from South Carolina to Calera, Alabama. At the time of the relocation, the mother was pregnant with the couple's only child, who was born on November 28, 2002.
The parties' relationship became strained after the birth of the child. The testimony in the record indicates that the major issue between the parties regarding their marriage centered on the mother's enforcement of a nap ritual for the parties' child. The father complained that the mother was extremely rigid about the child's nap and bedtime schedule and ritual. He said that she did not vary the schedule for family events and that he felt that the rigid schedule interfered with his ability to enjoy time with his child. The mother denied that the nap ritual was as strict as the father described.
The mother also testified that the father was abusive. Although she admitted that he had never struck her, she did accuse him of grabbing her by the arms, pushing her, holding her down, dragging her by the wrist, and blocking her from leaving a room. She described him as a man who became furious over small irritations, like her forgetting the dry cleaning or not having the house as clean as he would like. During his rages, she said, he would yell and would become so enraged that he would shake. The mother also accused the *223 father of belittling or insulting her during arguments. The father denied becoming furious or enraged, although he did admit that the parties argued and that he had said hurtful things to the mother.
On January 4, 2004, the parties were to attend dinner at the father's parents' home. According to the mother, while she was getting things ready to leave, the father became enraged over a travel DVD player that the mother's father had given to them as a Christmas present. In addition, said the mother, the father became furious with her because he saw that she had purchased a couple of bottles of wine. The mother testified that she telephoned the father's mother and that, as a result, the father ultimately left the marital residence; the mother said that he returned later with his mother to retrieve some of his belongings. The mother testified that the father told her when he left the marital residence a second time that he would be contacting an attorney. She said that the father telephoned her constantly that evening but she never answered. The father testified that he had telephoned the mother several times to tell her that he had been angry when he had threatened to contact a lawyer and that he did not intend to do so.
On January 5, 2004, the mother left the marital residence, taking the child with her. According to her testimony, she intended to leave only temporarily, seeking shelter and solace at her parents' home in Schaumberg, Illinois. However, the mother continued to reside in Schaumberg during a large part of the pendency of the divorce proceeding, which she instituted on January 8, 2004. In June 2004, the mother was awarded pendente lite custody of the child, and the father sought and received a court order instituting visitation with the child.
The mother testified that the child was involved with his extended family in Illinois, including his maternal grandparents and her two sisters and their children. She also noted that she had enrolled the child in several enrichment classes in the "Park District" and that she had taken the child to several activities suitable for a child his age. She testified, however, that she did not assert that Schaumberg, Illinois, was a better city in which to raise children than was the area surrounding Birmingham, Alabama.
During the summer months of 2004, the father visited the child fairly regularly in Illinois. However, the visitation did not always run smoothly. The father complained that no one in the mother's family was willing to meet him at the airport in Chicago with the child, so he was required to rent an automobile and drive to Schaumberg. In addition, he complained that the mother refused to give him the child's child-safety seat and that he was required to rent one for his use during the visits. The father explained that a two-day visit required him to be either traveling or in Illinois for four days. The costs of the visits, according to the father, ranged from $500 to $700.
After hearing two days of testimony in late May 2005, the trial court divorced the parties and reserved the issues of custody, visitation, and child support. After the conclusion of the testimony in late September 2005, the trial court, on December 20, 2005, entered a judgment awarding the parties joint legal custody of the child and awarding the mother physical custody of the child, provided that she relocate to Alabama. Specifically, the judgment stated:
"Based upon the evidence submitted, the Court finds that it is in the best interests of the minor child ... that his care, custody and control be shared by the *224 parties. The child shall primarily reside with the [mother] subject to the [mother's] relocation to the state of Alabama within sixty (60) days from the date of this Order. Said relocation shall be a distance within sixty (60) miles of the child's previous address in Calera, Alabama, preferably in North Shelby County or South Jefferson County in order to facilitate the parties' custodial periods and the scheduling of activities revolving around the child, and because of the quality of the area school systems. In the event the [mother] fails to relocate to the state of Alabama within sixty (60 days) from the date hereof, then the child's primary residence shall be with the [father]."
On January 5, 2006, the mother filed a postjudgment motion, on which the trial court held a hearing on February 28, 2006. After that date, but before the ruling on the motion, the trial judge's wife had a conversation with the father and an attorney friend on March 14, 2006; the trial judge notified the parties of this contact. The mother then filed a motion seeking the trial judge's recusal, which he granted.
On May 12, 2006, the mother filed a motion pursuant to Rule 60(b), Ala. R. Civ. P., seeking to have the December 2005 judgment set aside. The newly assigned trial judge granted the motion and entered the December 2005 order as a pendente lite order. In May 2006, the mother relocated to Alabama pursuant to that order. The trial court set a trial for August 2006.
During the next few months, the father enjoyed significantly increased visitation periods with the child. The testimony from the father and the child's paternal grandmother indicated that the child was insecure around them during the early visitations but that he was much improved by the time of the second trial, which was ultimately held in October 2006. The father described the child, who was approximately three and a half at the time, as lacking in speech and motor skills when he returned to Alabama. Specifically, the father complained that the child did not interact well with other children and that he appeared to be used to having his decisions made for him. The father also noted that the child persistently asked to be carried or picked up instead of walking or climbing up stairs himself. The father said that he began giving the child a simple choice between two options and requiring the answers "yes, sir," or "no, sir," to foster the child's verbal interaction and that he fostered the child's independence by making him walk and climb himself. The paternal grandmother echoed a few of the father's observations, indicating that the child had improved in his emotional security, that he was interacting well with other children, and that he was more outgoing and active than when he first returned to Alabama.
The child is enrolled in preschool in Birmingham. He is also enrolled in other enrichment programs commensurate with his age, including a gymnastics class and computer class, both offered through his preschool. The father takes advantage of opportunities to visit the preschool to read to the child's class and to eat lunch with the child. The father had also presented a scuba-diving demonstration to the child's class during a week when the children were studying the ocean.
The child has established a relationship with his paternal grandparents. In addition, the father's brother and his family, which includes a three-year-old girl and infant twin daughters, have included the child in family events. The child plays well with his three-year-old cousin.
After two days of testimony in October 2006 and a review of the transcript of the original trial, the trial court entered a judgment on December 29, 2006, awarding *225 physical custody to the mother, provided that she continue to live within 60 miles of Shelby County. The custody provision in the judgment reads, in part, as follows:
"Based upon the evidence submitted, the Court finds that it is in the best interests of the minor child, ... that his care, custody and control be shared by the parties. The child shall primarily reside with [the mother], subject to [the mother's] residing within sixty(60) miles of Shelby County, Alabama. [The father] shall be awarded custodial periods as set out below. The location of the child near [the father] will facilitate the parties' custodial periods and the scheduling of activities revolving around the child.
". . . .
"The Court finds that both parents have a substantial relationship with the minor child and appear to be loving and supportive parents. Both parents are very articulate and intelligent, but bring very different strengths and weaknesses to their job of parenting this child. The child will greatly benefit from having regular involvement with both parents. To allow [the mother] to remove the child to Schaumburg, Illinois would not promote the best interest of the child, because it would prevent the child from having regular contact with his father. [The mother] apparently has a very supportive and involved family in Schaumburg, Illinois, and while it might be beneficial to [the mother] to move to Illinois, any benefit to [the mother] would be outweighed by the detriment of removing the child from the many supportive relationships and contacts that he has in Alabama."
The mother appeals that judgment. She argues that the territorial restriction imposed by the trial court is an impermissible infringement of her right to travel, as secured by Article IV, § 2, of, and the 14th Amendment to, the United States Constitution. In her brief, she argues that the trial court lacks the power to impose a territorial restriction and that any statute that might give the trial court that power is unconstitutional as applied to the mother in this case. However, the mother never specified what statute she was challenging in either her brief to this court or at oral argument; furthermore, she never requested in her brief or at oral argument that this court reconsider its past holdings finding similar territorial restrictions to be constitutional as an exercise of the trial court's power to protect the best interests of the children before it. See Everett v. Everett, 660 So.2d 599, 601-02 (Ala.Civ. App.1995). Thus, we will consider the mother's constitutional argument as a challenge to the propriety of the restriction in this case based on the facts and circumstances as revealed by the record.
This court has considered territorial restrictions in numerous cases. See, e.g., Pointer v. Bell, 719 So.2d 222 (Ala.Civ. App.1998); Cohn v. Cohn, 658 So.2d 479 (Ala.Civ.App.1994), abrogated on other grounds by T.L.D. v. C.G., 849 So.2d 200 (Ala.Civ.App.2002); and McDaniel v. McDaniel, 621 So.2d 1328 (Ala.Civ.App. 1993). As we have explained, the trial court's power to impose a territorial restriction arises from its position as parens patriae over the children whose custody is in question:
"There is no wider area for the exercise of judicial discretion than that of providing for and protecting the best interests of children. Ex parte Handley, 460 So.2d 167 (Ala.1984). The court stands in the position of parens patria[e] of children. Ayers v. Kelley, 284 Ala. 321, 224 So.2d 673 (1969)....
"... [The husband] has been granted extensive rights to visit his children. *226 The obvious purpose of the limitation of residence of the children is to prevent their removal to a place which would increase the difficulty of exercising that visitation. Such provision benefits the husband and serves the interests of the children in being with their father. We have said in other cases that if such limitation is deemed not in the best interests of the children, it is subject to be changed upon proper petition and proof. Wheeler v. Wheeler, 585 So.2d 51 (Ala. Civ.App.1991)."
McDaniel, 621 So.2d at 1330.
As noted above, we have also had the opportunity to address constitutional challenges to territorial restrictions. See Hall v. Hall, 705 So.2d 397, 400 (Ala.Civ.App. 1997); Cohn, 658 So.2d at 481-82; and Everett, 660 So.2d at 601-02. In Everett, which was the first case to address the constitutional issue, we held that the best interest of the child took precedence over the parent's right to travel. Everett, 660 So.2d at 601-02. We explained our holding as follows:
"Here, the mother argues that the restriction violates her right to travel. This court has not addressed this constitutional issue in regard to residential restrictions on a parent with primary custody. Across the country, few cases have addressed this issue. In 1984, the Court of Appeals of Idaho ruled that the State had a `compelling governmental interest' that justified restricting the residence of the custodial parent, holding that the best interests of a child had priority over the parent's right to travel. Ziegler v. Ziegler, 107 Idaho 527, 691 P.2d 773 (Idaho App.1985) (citing Carlson v. Carlson, 8 Kan.App.2d 564, 661 P.2d 833 (1983))."
Id.
We were faced with the same constitutional argument in Cohn, in which we explained that "[r]estrictions on the movement of children may be upheld where the territorial restriction promotes or protects the best interests of the children involved." Cohn, 658 So.2d at 481. In Hall, we reversed the trial court's territorial restriction because it did not serve the best interests of the children. 705 So.2d at 400. However, we reiterated our earlier conclusion that a territorial restriction that is in the best interest of the child would take priority over a parent's right to travel, based on our holdings in both Everett and Cohn:
"The mother also contends that the conditional restriction on her moving to Minnesota is an impermissible restriction on her right to travel. This court noted in Everett v. Everett, 660 So.2d 599 (Ala.Civ.App.1995), that in some circumstances a parent's fundamental right to travel can be overcome by the compelling state interest in the best interests of a child. We also upheld a relocation restriction in Cohn v. Cohn, 658 So.2d 479, 481-82 (Ala.Civ.App.1994), cert. denied, 668 So.2d 575 (Ala.1995), in which we stated:
"`Restrictions on the movement of children may be upheld when the territorial restriction promotes or protects the best interests of the children involved....
"`... [T]he trial court's conclusion that removing the children from their current surroundings and environment at this time was not in their best interests is supported by ample evidence. We note that there is no prohibition against removal of the restriction in the future as the children's circumstances and needs change.
"`The mother's argument that the residence restriction on the children places an unreasonable or unconstitutional restriction on her ... is unpersuasive. *227 The territorial restriction applies to the children's residence, not to the mother's residence.'"
Hall, 705 So.2d at 400.
We believe that the holdings of Everett, Cohn, and Hall remain viable today and are supported by our legislature's enactment of both the joint-custody statute, codified at Ala.Code 1975, § 30-3-150 et seq., which embodies our state's policy that "children have frequent and continuing contact with [their] parents," § 30-3-150, and the Alabama Parent-Child Relationship Protection Act ("the Act"), codified at Ala.Code 1975, § 30-3-160 et seq., which embodies our state's philosophy that "children need both parents, even after a divorce, established in § 30-3-150." § 30-3-160. Section 30-3-169.4 requires that the trial court presume that the change in the principal residence[1] of a child is not in that child's best interest, and § 30-3-169.3 lists numerous factors for a trial court to consider when a custody determination is warranted under circumstances involving the possible change of the principal residence of a child, be it in a proceeding brought to challenge a proposed relocation, § 30-3-169.1, or in a proceeding involving an original child-custody determination. § 30-3-169.7.
Thus, we must consider whether the territorial restriction imposed by the trial court in the present case serves the best interest of the child in order to determine whether that restriction is unconstitutional as applied to the mother. Our standard of review in this situation is the oft-stated ore tenus standard. McDaniel, 621 So.2d at 1330. Because the trial court's factual findings in support of the judgment are presumed to be correct based upon the trial court's unique ability to both see and hear the witnesses before it and to judge their credibility, we may not reverse the trial court's judgment in this matter unless the evidence does not support the findings that support that judgment. Ex parte J.E., 1 So.3d 1002, 1008 (Ala.2008). In addition, because the propriety of the territorial restriction in question turns on whether it serves the best interest of the child, we should be mindful that "[t]he best interest standard affords freedom for the trial court to consider numerous and varied factors .... [T]here are no specific rules or guidelines that will control every case." Hodge v. Hovey, 679 So.2d 1145, 1148 (Ala.Civ.App. 1996).
As noted above, the Act applies to original custody determinations when a change in the child's principal residence is an issue. § 30-3-169.7. The mother asserted at oral argument that the Act applies only when a change of residence is contemplated. She contends that her desire to return to Illinois was not the type of change contemplated by the Act because the child had been living there until the pendente lite order required the mother to return to Alabama in May 2006. The mother asserts that the child's "actual" residence was Schaumberg, Illinois, and that the father had the burden of demonstrating the need to relocate the child under the Act. We disagree. The Act defines the "principal residence of a child," in pertinent part, as:
"c. In the absence of a determination by a court or an express agreement between the parents of a child whose *228 change of principal residence is at issue, the residence, if any, at which the child lived with the child's parents, a parent, or a person acting as a parent, for at least six consecutive months or, in the case of a child less than six months of age, the residence at which the child lived from birth with the child's parents, a parent, or a person acting as a parent. Periods of temporary absence from such residence are counted as part of the period of residence."
§ 30-3-161(10)c. As noted above, the mother testified that when she made her initial decision to leave the marital residence and go to Illinois, she did not intend for the move to be permanent. At the time she filed her divorce complaint only a few days later, the child's principal place of residence was Calera, Alabama, where he had resided with his parents for more than six months preceding the filing of the divorce complaint.[2]
Pursuant to § 30-3-169.7, a trial court making an original child-custody determination is to consider the factors enumerated in § 30-3-169.3(a). Those factors include:
"(1) The nature, quality, extent of involvement, and duration of the child's relationship with the person proposing to relocate with the child and with the non-relocating person, siblings, and other significant persons or institutions in the child's life.

*229 "(2) The age, developmental stage, needs of the child, and the likely impact the change of principal residence of a child will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child.
"(3) The increase in travel time for the child created by the change in principal residence of the child or a person entitled to custody of or visitation with the child.
"(4) The availability and cost of alternate means of communication between the child and the non-relocating party.
"(5) The feasibility of preserving the relationship between the non-relocating person and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
"(6) The preference of the child, taking into consideration the age and maturity of the child.
". . . .
"(8) The extent to which custody and visitation rights have been allowed and exercised.
"(9) Whether there is an established pattern of conduct of the person seeking to change the principal residence of a child, either to promote or thwart the relationship of the child and the non-relocating person.
"(10) Whether the person seeking to change the principal residence of a child, once out of the jurisdiction, is likely to comply with any new visitation arrangement and the disposition of that person to foster a joint parenting arrangement with the non-relocating party.
"(11) Whether the relocation of the child will enhance the general quality of life for both the custodial party seeking the change of principal residence of the child and the child, including, but not limited to, financial or emotional benefit or educational opportunities.
"(12) Whether or not a support system is available in the area of the proposed new residence of the child, especially in the event of an emergency or disability to the person having custody of the child.
". . . .
"(14) The stability of the family unit of the persons entitled to custody of and visitation with a child.
"(15) The reasons of each person for seeking or opposing a change of principal residence of a child.
"(16) Evidence relating to a history of domestic violence or child abuse.
"(17) Any other factor that in the opinion of the court is material to the general issue or otherwise provided by law."
§ 30-3-169.3(a).
The father asserts that a consideration of these factors supports the trial court's imposition of the territorial restriction, while the mother argues that they do not. She focuses her argument, in part, on the father's flexible schedule as a pilot and his resulting ability to travel more readily at a discounted rate or in a personal aircraft. In addition, she argues that the father's position as a commercial pilot who flies around the world cannot serve as a justification for the conclusion that allowing the child to live in Schaumberg would negatively impact the father's ability to have continuing contact with the child. The mother relies specifically on Carroll v. Carroll, 902 So.2d 696 (Ala.Civ.App.2004), to support her contention that the father's status as a pilot is a sufficient basis upon which to overturn the trial court's territorial restriction.
*230 In Carroll, this court did reverse a territorial restriction imposed upon a mother who desired to relocate from Birmingham, Alabama, to Luverne, Alabama, a distance of approximately 130 miles. Carroll, 902 So.2d at 702. The father in Carroll was a licensed commercial pilot who owned his own private airplane, although he had indicated that he had sold the aircraft to his sister. Id. at 698, 701, & n. 5. Because of his seniority in his employment, he was able to pick the days he worked and was off a total of 17 to 20 days per month, giving him remarkable flexibility in scheduling visitation with the child. Id. at 700. The father earned over $200,000 per year and had visited the child six times during a four-month period in 2000 when the mother and child resided in Luverne temporarily, indicating that the father was able to exercise meaningful visitation despite the distance between Birmingham and Luverne. Id. at 701. The distance between the cities necessitated an automobile ride of approximately 2 hours but took only 30 minutes by air. Id. at 698. Although the father also argued that the move was not being made in good faith and that the mother's family, with whom she would reside temporarily upon her relocation, created a hostile environment for visitation, this court concluded that the father had not proven those allegations. Id. at 701-02. Based upon all the facts, this court concluded that the restriction should be reversed. Id. at 702. Notably, Carroll was decided without consideration of the Act, because the Act had not been in effect when the trial court entered its judgment. Id. at 698 n. 2.
Turning to the present case, we note that a large amount of time at both trials was spent on testimony regarding the father's flexible schedule with UPS, his ability to fly standby with certain commercial airlines for a reduced fare, and his ability to borrow noncommercial airplanes for flights to Illinois. Some of those facts mirror a few of those found in Carroll, thus leading to the mother's reliance on that case as a basis for reversal. However, we cannot agree that Carroll requires reversal in this instance merely because the father in both cases is a commercial airline pilot.
The father's work schedule requires that he work for approximately 10 days per month; he is on call for approximately 16 days per month. The father typically knows his schedule one month in advance; however, at times, the schedule is subject to change. The father does not own his own private airplane; however, he has the opportunity to borrow airplanes owned by some of his friends to whom he provides flight instruction. If the father were to borrow an airplane, he would be responsible for the fuel costs for the flight; according to the father, in October 2006, the estimated fuel cost for round-trip travel from Shelby County to Illinois would be $1,500. If the father had to rent an airplane, he said, the cost for rental would range from $200 to $250 per hour. The father earns approximately $98,000 per year and is ranked in seniority as number 2,300 out of approximately 3,000 pilots. The father did say, however, that he would have money available to visit the child if necessary.
In contrast to the facts presented in Carroll, the father in the present case does not have seniority, does not earn over $200,000 per year, and cannot fly to visit his child in a mere 30 minutes. In addition, and more importantly, the policy of our state, as announced by our legislature in both the joint-custody statute and the Act, is to value close and frequent contact between a child and both of his or her parents. § 30-3-160 & § 30-3-150. The child flourished in the Birmingham area in the care and company of both parents and *231 his extended paternal family, and, from what appears in the record, the child was exposed to similar educational and cultural experiences in both Schaumberg and the Birmingham area. Based on the evidence in the present case, the trial court could certainly have determined, based on the conflicting testimony, that the distance between Schaumberg and Alabama and the cost of visitation would make the father's visitation more difficult and would negatively impact the amount of contact the father would have with the child, thus forming the basis for a conclusion that the territorial restriction is in the best interest of the child. Because the child's best interest is served by the restriction, it is not an unconstitutional infringement on the mother's right to travel. Everett, 660 So.2d at 601-02. Accordingly, we affirm the trial court's judgment imposing the territorial restriction.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in the result, with writing.
MOORE, Judge, concurring in the result.
I agree that the portion of the trial court's judgment imposing a territorial restriction on the custodial parent's residence should be affirmed; however, I rest my decision on grounds different from those set out in the main opinion.

I.
The evidence in the record shows that Christopher Meadows ("the father") and Lisa Meadows ("the mother") moved to Shelby County in 2002 to set up a permanent residence. Not long after the move, the mother gave birth to the parties' child. Following the birth of the child, problems between the mother and the father escalated to the point that, on January 5, 2004, the mother left the parties' permanent residence with the child. Within a few days, the mother had moved temporarily to her parents' home in Schaumberg, Illinois, taking the child with her. The mother filed for a divorce in Shelby County on January 8, 2004.
The Shelby Circuit Court ("the trial court") entered a pendente lite order on June 14, 2004, awarding custody of the child to the mother and awarding the father visitation to take place in Illinois two days a month. The father, a commercial pilot, flew to Illinois to attend visitations, using discount fares on commercial flights or piloting private aircraft borrowed from friends. The father would rent a car and a hotel room while in Illinois. The father paid the costs of these visits until the trial court ordered that the mother contribute a share of the costs.
On May 26 and 27, 2005, the trial court conducted a hearing on the divorce complaint. During that hearing, the mother testified that she and the child continued to live in her parents' home in Schaumberg, Illinois. In responding to her own attorney's question, the mother indicated that she understood that the trial court could order her to return to Alabama with the child. During cross-examination, the following colloquy took place:
"[FATHER'S ATTORNEY]: And you do have relatives here in Alabama, don't you?
"[MOTHER]: Yes, sir.
"Q: I believe you mentioned you have your grandmother  is that right  lives in Anniston?
"A: Yes, sir.
"Q: And you also have  I believe you testified you have an aunt in Huntsville. Correct?

*232 "A: Yes, sir.
"Q: And an uncle in Birmingham?
"A: Yes, sir.
"Q: And we've already established you also have friends here in Alabama with whom you can stay if you choose to do so?
"A: Yes, sir.
"Q: Do you have an objection to living in Alabama?

"A: No, sir."
(Emphasis added.)
Following the May 2005 hearing, the trial court continued the case, divorced the parties, and reserved a decision on other issues, including child custody. The court entered a second pendente lite order granting the father visitation with the child to take place in Alabama and Illinois at various times throughout the summer of 2005. The trial court then concluded the hearing on September 27 and 28, 2005. At that hearing, the mother testified that she wanted joint legal custody, but primary physical custody, of the child. The mother testified as follows:
"[FATHER'S ATTORNEY]: When you were in court back four months ago, as I understood your testimony, you told the Court that you would be willing to move back to Alabama if it meant keeping custody of your son.
"[MOTHER]: I don't recall saying that.
"Q: You don't recall that. Would you be willing to move back to Alabama?
"A: I would prefer to be with my support right now.
"Q: I didn't ask that. I said would you be willing to move to Alabama if it meant getting custody of your son?
"A: I'll do what the judge orders me to do."
On December 20, 2005, the trial court entered a final judgment awarding the parties joint legal custody of the child and awarding the mother primary physical custody of the child so long as she returned to Alabama and resided within 60 miles of the parties' previous address in Calera, "preferably in North Shelby County or South Jefferson County in order to facilitate the parties' custodial periods and the scheduling of activities revolving around the child, and because of the quality of the area school systems." The judgment further provided that if the mother did not comply with that provision within 60 days, the father would receive primary physical custody of the child.
On January 5, 2006, the mother filed a postjudgment motion to alter, amend, or vacate the judgment. As grounds for her motion, the mother maintained that the judgment was inconsistent with applicable Alabama law, that the judgment was contrary to the weight of the evidence, and that the judgment was inconsistent with the facts presented at trial. On February 28, 2006, the trial court heard the motion. The record does not contain a transcript of that hearing, but the mother does not assert that she argued in that hearing that the judgment should be set aside based on any infringement of her constitutional rights.
After the hearing, the father and one of his attorney friends met with the trial judge's wife. Based on that meeting, the mother filed a motion to recuse the trial judge, which was granted on March 17, 2006. That same date, the case was reassigned to a new judge within the same court. The mother then filed with this court a motion to extend the time for a ruling on her postjudgment motion. See Rule 59.1, Ala. R. Civ. P. This court granted the motion on March 30, 2006, giving the new trial judge until April 17, 2006, to rule on the postjudgment motion.
*233 The new trial judge did not rule on the postjudgment motion on or before April 17, 2006; therefore, it was denied by operation of law. See Rule 59.1, Ala. R. Civ. P. On May 12, 2006, the mother filed a Rule 60(b), Ala. R. Civ. P., motion. In that motion, the mother argued that the final judgment should be set aside because the new trial judge had not heard the postjudgment motion. The mother further argued against the territorial restriction on various grounds, including, for the first time, that she had not received "notice and an opportunity to dispute any conditioning of her custody on relocation" and that the restriction "denied [her] liberty without due process of law, as well as her privileges and immunities as a citizen of the United States."
On May 24, 2006, the new trial judge granted the Rule 60(b) motion and set aside the December 20, 2005, judgment. The trial court ordered a new trial and ordered that, until the new trial, the provisions of the December 20, 2005, judgment would remain in effect. The mother then moved to Alabama with the child to comply with that order.
The trial court conducted a final hearing on October 4, 2006. At that hearing, the mother, an optometrist, testified that she could not find work in her field at wages comparable to those she had earned in Illinois; that she had no relatives in Alabama that she could depend on to assist her with the child and to provide her with emotional support but that she did have such relatives in Illinois; and that she wanted to reside in Illinois where she and the child would be more comfortable and happier. The mother further testified that the father could easily and inexpensively visit the child in Illinois because of his piloting abilities and connections. The father presented evidence indicating that the mother could eventually earn comparable income in Alabama; that he could not easily and inexpensively visit the child in Illinois as the mother claimed; that he and his relatives, in particular the paternal grandmother, would assist the mother with the child; that the child had overcome developmental delays since moving back to Alabama and associating with his paternal relatives; and that the best interests of the child would be served by keeping the child in Alabama. At the conclusion of that hearing, the trial court indicated that it would consider the evidence presented in October 2006, along with the testimony presented at the original hearings in May and September 2005.
On December 29, 2006, the trial court entered a new judgment. The court again awarded the parties joint legal custody, with the mother receiving primary physical custody "subject to [the mother] residing within sixty (60) miles of Shelby County, Alabama." The judgment indicates that the purpose of that restriction is "to facilitate the parties' custodial periods and the scheduling of activities revolving around the child" and to assure that the child has regular contact with the father and maintains the supportive relationships and contacts that the child has in Alabama.

II.
The mother argues that the trial court erred in imposing the territorial restriction for several reasons. I originally questioned whether we could even review the substance of the judgment given the testimony of the mother in the 2005 hearings. It appeared to me that she had invited the error of which she complained by stating that she had no objection to being ordered to return to Alabama and that she would reside wherever the trial court ordered her to live. See Casey v. McConnell, 975 So.2d 384, 389 (Ala.Civ.App.2007) (quoting Neal v. Neal, 856 So.2d 766, 784 (Ala.2002)) *234 ("`[a] party cannot win a reversal on an error that party has invited the trial court to commit'"). However, the mother successfully convinced the trial court to conduct a new trial on the territorial-restriction issue, at which she testified differently without objection from the father. Therefore, I believe the invited-error doctrine does not apply to the December 2006 judgment.
For an additional reason, I also on first blush believed that the mother had waived her constitutional argument. The mother raised her constitutional challenge to the December 2005 judgment for the first time in her Rule 60(b) motion. I doubt whether any of the provisions of Rule 60(b) authorize a trial court to set aside a judgment based on a constitutional challenge not raised during trial or in a Rule 59 motion. See Harp v. Harp, 462 So.2d 372, 374 (Ala.Civ.App.1984); and Burton v. Burton, 379 So.2d 617, 618 (Ala.Civ.App.1980). However, the father did not cross-appeal or argue to this court that the mother had waived her constitutional argument on that ground; therefore, I believe the court may not review the correctness of the trial court's order granting the Rule 60(b) motion, and I believe the constitutional argument is properly before the court.

III.
I agree with the main opinion that Alabama courts have the power to assign territorial restrictions based on the best interests of the child and that the evidence supports a finding that the child's best interests are served by the territorial restriction in this case. 3 So.3d at 226. The issue separating the court is the proper analysis for determining whether a territorial restriction violates a custodial parent's constitutional right to travel. The majority believes that if the territorial restriction is in the best interests of the child, then for that reason alone it is not unconstitutional. I disagree.
The mother correctly argues that one of the privileges and immunities afforded citizens of the United States is the fundamental right to migrate, resettle, find a new job, and start a new life in a state of his or her own choosing. Shapiro v. Thompson, 394 U.S. 618, 629, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), overruled on other grounds by Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and Hall v. Hall, 705 So.2d 397, 400 (Ala. Civ.App.1997). I believe, contrary to Cohn v. Cohn, 658 So.2d 479, 481-82 (Ala.Civ. App.1994), overruled on other grounds by T.L.D. v. C.G., 849 So.2d 200 (Ala.Civ.App. 2002), that when a trial court conditions parental custody of a child on the maintenance of a residence within a certain geographical area, that order impinges on the parent's fundamental right to travel. Although the restriction does not per se prevent the parent from moving outside the geographical area, it does place such a burden on the parent's movement  the sacrifice of the physical custody of the child  that it has a chilling effect on the parent's right to travel. See Jaramillo v. Jaramillo, 113 N.M. 57, 64, 823 P.2d 299, 306 (1991) ("[I]t makes no difference that the parent who wishes to relocate is not prohibited outright from doing so; a legal rule that operates to chill the exercise of the right, absent a sufficient state interest to do so, is as impermissible as one that bans exercise of the right altogether."); and In re Marriage of Ciesluk, 113 P.3d 135, 142 (Colo.2005) (holding that although the Colorado statute at issue "does not prohibit outright a majority time parent from relocating, it chills the exercise of that parent's right to travel because, in seeking to relocate, that parent risks losing majority parent status with respect to the minor child").
*235 Cases from within Alabama and elsewhere uniformly hold that a restriction on a parent's right to travel is not unconstitutional if it is imposed to protect a compelling interest. See Memorial Hosp. v. Maricopa County, 415 U.S. 250, 254, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); Hall, 705 So.2d at 400; Everett v. Everett, 660 So.2d 599, 601-02 (Ala.Civ.App.1995); and In re Custody of D.M.G., 287 Mont. 120, 951 P.2d 1377 (1998). In upholding territorial restrictions against constitutional challenges, our past cases concentrate exclusively on the parens patriae state interest of promoting the best interests of the child. See Everett, supra; and Hall, supra. Those cases hold that the state has a compelling interest in promoting the best interests of the child and that that interest alone is sufficient to justify a court order restricting a custodial parent from moving with the child outside a specified area.
"`"Parens patriae," literally "parent of the country," refers traditionally to role of state as sovereign and guardian of persons under legal disability.'" Ex parte Bayliss, 550 So.2d 986, 988 n. 1 (Ala.1989) (quoting Black's Law Dictionary 1003 (5th ed.1979)). Pursuant to the parens patriae doctrine, "`"the primary control and custody of infants is with the government, to be delegated, as of course, to their natural guardians and protectors, so long as such guardians are suitable persons to exercise it."'" Ex parte Wright, 225 Ala. 220, 222, 142 So. 672, 674 (1932). See also Fletcher v. Preston, 226 Ala. 665, 148 So. 137 (1933); and Striplin v. Ware, 36 Ala. 87 (1860). In other words, the state is the father and mother of the child and the natural parents are not entitled to custody, except upon the state's beneficent recognition that natural parents presumably will be the best of its citizens to delegate its custodial powers. See Chandler v. Whatley, 238 Ala. 206, 208, 189 So. 751, 753 (1939) (quoting Striplin v. Ware, 36 Ala. at 89) ("`The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted.'").
In a string of decisions, the United States Supreme Court has impliedly rejected the theory underlying the parens patriae doctrine by recognizing that it is a natural parent, not the state, who has a fundamental right to the care, custody, and control of a child. See Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children `come[s] to this Court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements.'" (quoting Kovacs v. Cooper, 336 U.S. 77, 95, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (Frankfurter, J., concurring))); Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); Parham v. J.R., 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d *236 101 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course."); Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); and Troxel v. Granville, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("The liberty interest at issue in this case  the interest of parents in the care, custody, and control of their children  is perhaps the oldest of the fundamental liberty interests recognized by this Court."). Therefore, the state may no longer be considered "the parent of the country," and it is the actual parents, not the state, who maintain a compelling interest in promoting the best interests of the child. R.S.C. v. J.B.C., 812 So.2d 361, 365-66 n. 1 (Ala. Civ.App.2001) (plurality opinion) (citing Hawk v. Hawk, 855 S.W.2d 573 (Tenn. 1993) (rejecting argument that state has compelling interest in the best interests of a child); and Hoff v. Berg, 595 N.W.2d 285, 291-92 (N.D.1999)).
In many cases, such as the one at bar, the parties, both of whom are fit parents, hold equal custodial and constitutional rights to the child. See Fredman v. Fredman, 960 So.2d 52, 56 (Fla.Dist.Ct.App. 2007) ("To the extent that the mother is arguing that she has a fundamental right as a parent to decide where her children live, she must recognize that the father shares the same fundamental right."). In the course of a divorce proceeding, when the parties cannot reach an agreement as to that course of action that serves the best interests of the child, a state court has the jurisdiction to resolve that dispute. Morgan v. Morgan, 964 So.2d 24, 29-30 (Ala.Civ.App.2007). However, I cannot agree that the limited power to adjudicate disputes between two fit parents and to decide which of two parental choices corresponds most closely with the best interests of the child vests the state with a compelling interest in the child. Hence, I would not rely on the state's interest in promoting the best interests of the child as a justification for the territorial restriction.[3]
The father and the child share reciprocal fundamental constitutional rights to association with one another. See Fredman, supra; see also McQuinn v. McQuinn, 866 So.2d 570, 573 (Ala.Civ.App.2003) ("We note that although the mother, not [the] father, is the primary physical custodian of the children, the father's fundamental right to direct the care, control, and association of his children is no less fundamental and protected than the right of the mother to do the same."); and Jackson v. Jackson, 999 So.2d 488, 494 (Ala.Civ.App. 2007) (Moore, J., with Pittman and Thomas, JJ., concurring in the result) ("The children have a fundamental right to free association with their mother."). Hence, the noncustodial parent and the child have a compelling interest in assuring that their fundamental constitutional rights are not unduly impaired by the custodial parent's choice of residence. If the state has any compelling interest in the matter, it is in preserving the familial relationship between the father and the child. See Soohoo v. Johnson, 731 N.W.2d 815, 822 (Minn.2007) (holding that a state has a compelling interest in promoting relationships among those in recognized family *237 units). It is that interest that a trial court is required to balance against the mother's right to travel when deciding whether to employ a territorial restriction. See Fredman, supra.

IV.
In this case, the trial court assigned the territorial restriction because it believed that the restriction will assure a continuing and meaningful relationship between the father, the noncustodial parent, and the child. The mother testified that the father was a good parent, and the evidence shows that the child's relationship with the father has had a positive impact on the child. The mother does not argue that the relationship between the father and the child should be discouraged; rather, the mother merely argues that their relationship would not be impaired if she and the child returned to Illinois.
The mother first points out that the father can maintain the same relationship with the child because of the father's unique ability to travel cheaply and easily to Illinois. The evidence on that point was conflicting, and the trial court evidently determined that the costs and scheduling involved would make it impractical for the father to fly routinely to Illinois to exercise visitation and that the consequent decrease in visitation would undermine the relationship between the father and the child. Based on our standard of review, we cannot disturb a finding based on conflicting evidence. V.L.T. v. C.T.T., 603 So.2d 1076, 1077 (Ala.Civ.App.1992).
The mother also points out that because of his work schedule the father is out of the prescribed area for at least one-half of every month. Although the father somewhat disagrees with that assessment, it is undisputed that the father spends and will spend many days outside Alabama while working. The father's work schedule undoubtedly interferes with his ability to visit and associate personally with the child. The trial court could have reasonably concluded that any further protracted interference should be avoided. By imposing the territorial restriction, the trial court assured that during the long periods when the father was not working, he could actually be with the child, rather than traveling to and from Illinois in a mere effort to see the child. Although I do not necessarily agree that the territorial restriction was the only method available to the trial court to address this problem, the mother has not argued that the trial court failed to use the most narrowly tailored means of protecting the father and the child's right to familial association, and based on our standard of review, we cannot substitute our opinion for that of the trial court. Ex parte Roberts, 796 So.2d 349, 351-52 (Ala. 2001).

V.
Because the trial court properly found that the territorial restriction will protect the familial relationship between the child and the father, it did not act unconstitutionally in imposing that restriction on the mother, although the restriction does impinge on her right to travel to and reside in Illinois. Therefore, I concur in the affirmance of the trial court's judgment.
NOTES
[1] Subject to certain exceptions not applicable here, the Act applies in those situations in which the planned relocation is to a residence more than 60 miles from the child's principal place of residence, unless the move results in the child being located closer to the noncustodial parent, provided, however, that the relocation does not result in the child's living in another state. § 30-3-162(b).
[2] To allow the mother's decision to leave the marital residence to impact a determination of the child's principal place of residence in this case would appear to run afoul of the Parental Kidnaping Prevention Act ("PKPA"), codified at 28 U.S.C. § 1738A, and the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA"), codified at Ala.Code 1975, § 30-3B-101 et seq. Both acts are designed to resolve disputes among the states regarding which state has jurisdiction to determine the custody of children when the parents are residing in two separate states.

Under the PKPA,
"`home State' means the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons. Periods of temporary absence of any of such persons are counted as part of the six-month or other period."
28 U.S.C. § 1738A(b)(4). In order for an issuing court's child-custody determination to meet the requirements of the PKPA and be entitled to full faith and credit in the courts of its sister states, the issuing court must have jurisdiction under its own laws and:
"(2) one of the following conditions [must be] met:
"(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State."
28 U.S.C. § 1738A(c)(2)(A).
The UCCJEA defines "home state" as:
"The state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of the child or any of the mentioned persons is part of the period."
§ 30-3B-102(7). Consistent with the PKPA, in the absence of special emergency circumstances, see § 30-3B-204, Alabama has jurisdiction to make an initial child-custody determination only if:
"(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state."
§ 30-3B-201(a)(1).
[3] In her initial appellant's brief to this court, the mother argued that a court cannot attempt to control the residence of a child's custodian "`unless clear evidence ... establishes the detrimental effect ... upon the children.'" (Quoting Watt v. Watt, 971 P.2d 608, 616 (Wyo.1999)). However, at oral argument the mother abandoned that position. Therefore, I do not address the issue whether the state's compelling interest in protecting children from parental harm may warrant the imposition of a territorial restriction.