THOMAS, Judge.
Lisa M. Meadows (“the mother”) and Christopher G. Meadows (“the father”) were married in September 2000. The parties first met while the mother was enrolled in optometry school at the University of Alabama at Birmingham. After their marriage, the parties lived in South Carolina. The mother was employed as an optometrist; the father was a pilot, originally for another company, and then for United Parcel Service (“UPS”). In August 2002, the parties moved from South Carolina to Calera, Alabama. At the time of the relocation, the mother was pregnant with the couple’s only child, who was born on November 28, 2002.
The parties’ relationship became strained after the birth of the child. The testimony in the record indicates that the major issue between the parties regarding their marriage centered on the mother’s enforcement of a nap ritual for the parties’ child. The father complained that the mother was extremely rigid about the child’s nap and bedtime schedule and ritual. He said that she did not vary the schedule for family events and that he felt that the rigid schedule interfered with his ability to enjoy time with his child. The mother denied that the nap ritual was as strict as the father described.
The mother also testified that the father was abusive. Although she admitted that he had never struck her, she did accuse him of grabbing her by the arms, pushing her, holding her down, dragging her by the wrist, and blocking her from leaving a room. She described him as a man who became furious over small irritations, like her forgetting the dry cleaning or not having the house as clean as he would like. During his rages, she said, he would yell and would become so enraged that he would shake. The mother also accused the *223 father of belittling or insulting her during arguments. The father denied becoming furious or enraged, although he did admit that the parties argued and that he had said hurtful things to the mother.
On January 4, 2004, the parties were to attend dinner at the father’s parents’ home. According to the mother, while she was getting things ready to leave, the father became enraged over a travel DVD player that the mother’s father had given to them as a Christmas present. In addition, said the mother, the father became furious with her because he saw that she had purchased a couple of bottles of wine. The mother testified that she telephoned the father’s mother and that, as a result, the father ultimately left the marital residence; the mother said that he returned later with his mother to retrieve some of his belongings. The mother testified that the father told her when he left the marital residence a second time that he would be contacting an attorney. She said that the father telephoned her constantly that evening but she never answered. The father testified that he had telephoned the mother several times to tell her that he had been angry when he had threatened to contact a lawyer and that he did not intend to do so.
On January 5, 2004, the mother left the marital residence, taking the child with her. According to her testimony, she intended to leave only temporarily, seeking shelter and solace at her parents’ home in Sehaumberg, Illinois. However, the mother continued to reside in Sehaumberg during a large part of the pendency of the divorce proceeding, which she instituted on January 8, 2004. In June 2004, the mother was awarded pendente lite custody of the child, and the father sought and received a court order instituting visitation with the child.
The mother testified that the child was involved with his extended family in Illinois, including his maternal grandparents and her two sisters and their children. She also noted that she had enrolled the child in several enrichment classes in the “Park District” and that she had taken the child to several activities suitable for a child his age. She testified, however, that she did not assert that Sehaumberg, Illinois, was a better city in which to raise children than was the area suirounding Birmingham, Alabama.
During the summer months of 2004, the father visited the child fairly regularly in Illinois. However, the visitation did not always run smoothly. The father complained that no one in the mother’s family was willing to meet him at the airport in Chicago with the child, so he was required to rent an automobile and drive to Sehaumberg. In addition, he complained that the mother refused to give him the child’s child-safety seat and that he was required to rent one for his use during the visits. The father explained that a two-day visit required him to be either traveling or in Illinois for four days. The costs of the visits, according to the father, ranged from $500 to $700.
After hearing two days of testimony in late May 2005, the trial court divorced the parties and reserved the issues of custody, visitation, and child support. After the conclusion of the testimony in late September 2005, the trial court, on December 20, 2005, entered a judgment awarding the parties joint legal custody of the child and awarding the mother physical custody of the child, provided that she relocate to Alabama. Specifically, the judgment stated:
“Based upon the evidence submitted, the Court finds that it is in the best interests of the minor child ... that his care, custody and control be shared by the *224 parties. The child shall primarily reside with the [mother] subject to the [mother’s] relocation to the state of Alabama within sixty (60) days from the date of this Order. Said relocation shall be a distance within sixty (60) miles of the child’s previous address in Calera, Alabama, preferably in North Shelby County or South Jefferson County in order to facilitate the parties’ custodial periods and the scheduling of activities revolving around the child, and because of the quality of the area school systems. In the event the [mother] fails to relocate to the state of Alabama within sixty (60 days) from the date hereof, then the child’s primary residence shall be with the [father].”
On January 5, 2006, the mother filed a postjudgment motion, on which the trial court held a hearing on February 28, 2006. After that date, but before the ruling on the motion, the trial judge’s wife had a conversation with the father and an attorney friend on March 14, 2006; the trial judge notified the parties of this contact. The mother then filed a motion seeking the tidal judge’s recusal, which he granted.
On May 12, 2006, the mother filed a motion pursuant to Rule 60(b), Ala. R. Civ. P., seeking to have the December 2005 judgment set aside. The newly assigned trial judge granted the motion and entered the December 2005 order as a pendente lite order. In May 2006, the mother relocated to Alabama pursuant to that order. The trial court set a trial for August 2006.
During the next few months, the father enjoyed significantly increased visitation periods with the child. The testimony from the father and the child’s paternal grandmother indicated that the child was insecure around them during the early visitations but that he was much improved by the time of the second trial, which was ultimately held in October 2006. The father described the child, who was approximately three and a half at the time, as lacking in speech and motor skills when he returned to Alabama. Specifically, the father complained that the child did not interact well with other children and that he appeared to be used to having his decisions made for him. The father also noted that the child persistently asked to be carried or picked up instead of walking or climbing up stairs himself. The father said that he began giving the child a simple choice between two options and requiring the answers “yes, sir,” or “no, sir,” to foster the child’s verbal interaction and that he fostered the child’s independence by making him walk and climb himself. The paternal grandmother echoed a few of the father’s observations, indicating that the child had improved in his emotional security, that he was interacting well with other children, and that he was more outgoing and active than when he first returned to Alabama.
The child is enrolled in preschool in Birmingham. He is also enrolled in other enrichment programs commensurate with his age, including a gymnastics class and computer class, both offered through his preschool. The father takes advantage of opportunities to visit the preschool to read to the child’s class and to eat lunch with the child. The father had also presented a scuba-diving demonstration to the child’s class during a week when the children were studying the ocean.
The child has established a relationship with his paternal grandparents. In addition, the father’s brother and his family, which includes a three-year-old girl and infant twin daughters, have included the child in family events. The child plays well with his three-year-old cousin.
After two days of testimony in October 2006 and a review of the transcript of the original trial, the trial court entered a judgment on December 29, 2006, awarding *225 physical custody to the mother, provided that she continue to live within 60 miles of Shelby County. The custody provision in the judgment reads, in part, as follows:
“Based upon the evidence submitted, the Court finds that it is in the best interests of the minor child, ... that his care, custody and control be shared by the parties. The child shall primarily reside with [the mother], subject to [the mother’s] residing within sixty(60) miles of Shelby County, Alabama. [The father] shall be awarded custodial periods as set out below. The location of the child near [the father] will facilitate the parties’ custodial periods and the scheduling of activities revolving around the child.
“The Court finds that both parents have a substantial relationship with the minor child and appear to be loving and supportive parents. Both parents are very articulate and intelligent, but bring very different strengths and weaknesses to them job of parenting this child. The child will greatly benefit from having regular involvement with both parents. To allow [the mother] to remove the child to Schaumburg, Illinois would not promote the best interest of the child, because it would prevent the child from having regular contact with his father. [The mother] apparently has a very supportive and involved family in Schaum-burg, Illinois, and while it might be beneficial to [the mother] to move to Illinois, any benefit to [the mother] would be outweighed by the detriment of removing the child from the many supportive relationships and contacts that he has in Alabama.”
The mother appeals that judgment. She argues that the territorial restriction imposed by the trial court is an impermissible infringement of her right to travel, as secured by Article IV, § 2, of, and the 14th Amendment to, the United States Constitution. In her brief, she argues that the trial court lacks the power to impose a territorial restriction and that any statute that might give the trial court that power is unconstitutional as applied to the mother in this ease. However, the mother never specified what statute she was challenging in either her brief to this court or at oral argument; furthermore, she never requested in her brief or at oral argument that this court reconsider its past holdings finding similar territorial restrictions to be constitutional as an exercise of the trial court’s power to protect the best interests of the children before it. See Everett v. Everett, 660 So.2d 599, 601-02 (Ala.Civ. App.1995). Thus, we will consider the mother’s constitutional argument as a challenge to the propriety of the restriction in this case based on the facts and circumstances as revealed by the record.
This court has considered territorial restrictions in numerous cases. See, e.g., Pointer v. Bell, 719 So.2d 222 (Ala.Civ. App.1998); Cohn v. Cohn, 658 So.2d 479 (Ala.Civ.App.1994), abrogated on other grounds by T.L.D. v. C.G., 849 So.2d 200 (Ala.Civ.App.2002); and McDaniel v. McDaniel, 621 So.2d 1328 (Ala.Civ.App. 1993). As we have explained, the trial court’s power to impose a territorial restriction arises from its position as parens patriae over the children whose custody is in question:
“There is no wider area for the exercise of judicial discretion than that of providing for and protecting the best interests of children. Ex parte Handley, 460 So.2d 167 (Ala.1984). The court stands in the position of parens patria[e] of children. Ayers v. Kelley, 284 Ala. 321, 224 So.2d 673 (1969)....
“ ... [The husband] has been granted extensive rights to visit his children.
*226 The obvious purpose of the limitation of residence of the children is to prevent their removal to a place which would increase the difficulty of exercising that visitation. Such provision benefits the husband and serves the interests of the children in being with their father. We have said in other cases that if such limitation is deemed not in the best interests of the children, it is subject to be changed upon proper petition and proof. Wheeler v. Wheeler, 585 So.2d 51 (Ala. Civ.App.1991).”
McDaniel, 621 So.2d at 1330.
As noted above, we have also had the opportunity to address constitutional challenges to territorial restrictions. See Hall v. Hall, 705 So.2d 397, 400 (Ala.Civ.App. 1997); Cohn, 658 So.2d at 481-82; and Everett, 660 So.2d at 601-02. In Everett, which was the first case to address the constitutional issue, we held that the best interest of the child took precedence over the parent’s right to travel. Everett, 660 So.2d at 601-02. We explained our holding as follows:
“Here, the mother argues that the restriction violates her right to travel. This court has not addressed this constitutional issue in regard to residential restrictions on a parent with primary custody. Across the country, few cases have addressed this issue. In 1984, the Court of Appeals of Idaho ruled that the State had a ‘compelling governmental interest’ that justified restricting the residence of the custodial parent, holding that the best interests of a child had priority over the parent’s right to travel. Ziegler v. Ziegler, 107 Idaho 527, 691 P.2d 773 (Idaho App.1985) (citing Carlson v. Carlson, 8 Kan.App.2d 564, 661 P.2d 833 (1983)).”

Id.

We were faced with the same constitutional argument in Cohn, in which we explained that “[rjestrictions on the movement of children may be upheld where the territorial restriction promotes or protects the best interests of the children involved.” Cohn, 658 So.2d at 481. In Hall, we reversed the trial court’s territorial restriction because it did not serve the best interests of the children. 705 So.2d at 400. However, we reiterated our earlier conclusion that a territorial restriction that is in the best interest of the child would take priority over a parent’s right to travel, based on our holdings in both Everett and Cohn:
“The mother also contends that the conditional restriction on her moving to Minnesota is an impermissible restriction on her right to travel. This court noted in Everett v. Everett, 660 So.2d 599 (Ala.Civ.App.1995), that in some circumstances a parent’s fundamental right to travel can be overcome by the compelling state interest in the best interests of a child. We also upheld a relocation restriction in Cohn v. Cohn, 658 So.2d 479, 481-82 (Ala.Civ.App.1994), cert. denied, 668 So.2d 575 (Ala.1995), in which we stated:
“ ‘Restrictions on the movement of children may be upheld when the territorial restriction promotes or protects the best interests of the children involved....
“ ‘... [T]he trial court’s conclusion that removing the children from their current surroundings and environment at this time was not in their best interests is supported by ample evidence. We note that there is no prohibition against removal of the restriction in the future as the children’s circumstances and needs change.
“ ‘The mother’s argument that the residence restriction on the children places an unreasonable or unconstitutional restriction on her ... is unper-
*227 suasive. The territorial restriction applies to the children’s residence, not to the mother’s residence.’ ”
Hall, 705 So.2d at 400.
We believe that the holdings of Everett, Cohn, and Hall remain viable today and are supported by our legislature’s enactment of both the joint-custody statute, codified at Ala.Code 1975, § 30-3-150 et seq., which embodies our state’s policy that “children have frequent and continuing contact with [them] parents,” § 30-3-150, and the Alabama Parent-Child Relationship Protection Act (“the Act”), codified at Ala.Code 1975, § 30-3-160 et seq., which embodies our state’s philosophy that “children need both parents, even after a divorce, established in § 30-3-150.” § 30-3-160. Section 30-3-169.4 requires that the trial court presume that the change in the principal residence[1] of a child is not in that child’s best interest, and § 30-3-169.3 lists numerous factors for a trial court to consider when a custody determination is warranted under circumstances involving the possible change of the principal residence of a child, be it in a proceeding brought to challenge a proposed relocation, § 30-3-169.1, or in a proceeding involving an original child-custody determination. § 30-3-169.7.
Thus, we must consider whether the territorial restriction imposed by the trial court in the present case serves the best interest of the child in order to determine whether that restriction is unconstitutional as applied to the mother. Our standard of review in this situation is the oft-stated ore tenus standard. McDaniel, 621 So.2d at 1330. Because the trial court’s factual findings in support of the judgment are presumed to be correct based upon the trial court’s unique ability to both see and hear the witnesses before it and to judge their credibility, we may not reverse the trial court’s judgment in this matter unless the evidence does not support the findings that support that judgment. Ex parte J.E., 1 So.3d 1002, 1008 (Ala.2008). In addition, because the propriety of the territorial restriction in question turns on whether it serves the best interest of the child, we should be mindful that “[t]he best interest standard affords freedom for the trial court to consider numerous and varied factors .... [T]here are no specific rules or guidelines that will control every case.” Hodge v. Hovey, 679 So.2d 1145, 1148 (Ala.Civ.App. 1996).
As noted above, the Act applies to original custody determinations when a change in the child’s principal residence is an issue. § 30-3-169.7. The mother asserted at oral argument that the Act applies only when a change of residence is contemplated. She contends that her desire to return to Illinois was not the type of change contemplated by the Act because the child had been living there until the pendente lite order required the mother to return to Alabama in May 2006. The mother asserts that the child’s “actual” residence was Schaumberg, Illinois, and that the father had the burden of demonstrating the need to relocate the child under the Act. We disagree. The Act defines the “principal residence of a child,” in pertinent part, as:
“e. In the absence of a determination by a court or an express agreement between the parents of a child whose *228 change of principal residence is at issue, the residence, if any, at which the child lived with the child’s parents, a parent, or a person acting as a parent, for at least six consecutive months or, in the case of a child less than six months of age, the residence at which the child lived from birth with the child’s parents, a parent, or a person acting as a parent. Periods of temporary absence from such residence are counted as part of the period of residence.”
§ 30-3-161(10)e. As noted above, the mother testified that when she made her initial decision to leave the marital residence and go to Illinois, she did not intend for the move to be permanent. At the time she filed her divorce complaint only a few days later, the child’s principal place of residence was Calera, Alabama, where he had resided with his parents for more than six months preceding the filing of the divorce complaint.[2]
Pursuant to § 30-3-169.7, a trial court making an original child-custody determination is to consider the factors enumerated in § 30-3-169.3(a). Those factors include:
“(1) The nature, quality, extent of involvement, and duration of the child’s relationship with the person proposing to relocate with the child and with the non-relocating person, siblings, and other significant persons or institutions in the child’s life.
*229 “(2) The age, developmental stage, needs of the child, and the likely impact the change of principal residence of a child will have on the child’s physical, educational, and emotional development, taking into consideration any special needs of the child.
“(3) The increase in travel time for the child created by the change in principal residence of the child or a person entitled to custody of or visitation with the child.
“(4) The availability and cost of alternate means of communication between the child and the non-relocating party.
“(5) The feasibility of preserving the relationship between the non-relocating person and the child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.
“(6) The preference of the child, taking into consideration the age and maturity of the child.
“(8) The extent to which custody and visitation rights have been allowed and exercised.
“(9) Whether there is an established pattern of conduct of the person seeking to change the principal residence of a child, either to promote or thwart the relationship of the child and the non-relocating person.
“(10) Whether the person seeking to change the principal residence of a child, once out of the jurisdiction, is likely to comply with any new visitation arrangement and the disposition of that person to foster a joint parenting arrangement with the non-relocating party.
“(11) Whether the relocation of the child will enhance the general quality of life for both the custodial party seeking the change of principal residence of the child and the child, including, but not limited to, financial or emotional benefit or educational opportunities.
“(12) Whether or not a support system is available in the area of the proposed new residence of the child, especially in the event of an emergency or disability to the person having custody of the child.
“(14) The stability of the family unit of the persons entitled to custody of and visitation with a child.
“(15) The reasons of each person for seeking or opposing a change of principal residence of a child.
“(16) Evidence relating to a history of domestic violence or child abuse.
“(17) Any other factor that in the opinion of the court is material to the general issue or otherwise provided by law.”
§ 30-3-169.3(a).
The father asserts that a consideration of these factors supports the trial court’s imposition of the territorial restriction, while the mother argues that they do not. She focuses her argument, in part, on the father’s flexible schedule as a pilot and his resulting ability to travel more readily at a discounted rate or in a personal aircraft. In addition, she argues that the father’s position as a commercial pilot who flies around the world cannot serve as a justification for the conclusion that allowing the child to live in Schaumberg would negatively impact the father’s ability to have continuing contact with the child. The mother relies specifically on Carroll v. Carroll, 902 So.2d 696 (Ala.Civ.App.2004), to support her contention that the father’s status as a pilot is a sufficient basis upon which to overturn the trial court’s territorial restriction.
*230 In Carroll, this court did reverse a territorial restriction imposed upon a mother who desired to relocate from Birmingham, Alabama, to Luverne, Alabama, a distance of approximately 130 miles. Carroll, 902 So.2d at 702. The father in Carroll was a licensed commercial pilot who owned his own private airplane, although he had indicated that he had sold the air-craft to his sister. Id. at 698, 701, & n. 5. Because of his seniority in his employment, he was able to pick the days he worked and was off a total of 17 to 20 days per month, giving him remarkable flexibility in scheduling visitation with the child. Id. at 700. The father earned over $200,000 per year and had visited the child six times during a four-month period in 2000 when the mother and child resided in Luverne temporarily, indicating that the father was able to exercise meaningful visitation despite the distance between Birmingham and Lu-verne. Id. at 701. The distance between the cities necessitated an automobile ride of approximately 2 hours but took only 30 minutes by air. Id. at 698. Although the father also argued that the move was not being made in good faith and that the mother’s family, with whom she would reside temporarily upon her relocation, created a hostile environment for visitation, this court concluded that the father had not proven those allegations. Id. at 701-02. Based upon all the facts, this court concluded that the restriction should be reversed. Id. at 702. Notably, Carroll was decided without consideration of the Act, because the Act had not been in effect when the trial court entered its judgment. Id. at 698 n. 2.
Turning to the present case, we note that a large amount of time at both trials was spent on testimony regarding the father’s flexible schedule with UPS, his ability to fly standby with certain commercial airlines for a reduced fare, and his ability to borrow noncommercial airplanes for flights to Illinois. Some of those facts mirror a few of those found in Carroll, thus leading to the mother’s reliance on that case as a basis for reversal. However, we cannot agree that Canvll requires reversal in this instance merely because the father in both cases is a commercial airline pilot.
The father’s work schedule requires that he work for approximately 10 days per month; he is on call for approximately 16 days per month. The father typically knows his schedule one month in advance; however, at times, the schedule is subject to change. The father does not own his own private airplane; however, he has the opportunity to borrow airplanes owned by some of his friends to whom he provides flight instruction. If the father were to borrow an airplane, he would be responsible for the fuel costs for the flight; according to the father, in October 2006, the estimated fuel cost for round-trip travel from Shelby County to Illinois would be $1,500. If the father had to rent an airplane, he said, the cost for rental would range from $200 to $250 per hour. The father earns approximately $98,000 per year and is ranked in seniority as number 2,300 out of approximately 3,000 pilots. The father did say, however, that he would have money available to visit the child if necessary.
In contrast to the facts presented in Carroll, the father in the present case does not have seniority, does not earn over $200,000 per year, and cannot fly to visit his child in a mere 30 minutes. In addition, and more importantly, the policy of our state, as announced by our legislature in both the joint-custody statute and the Act, is to value close and frequent contact between a child and both of his or her parents. § 30-3-160 & § 30-3-150. The child flourished in the Birmingham area in the care and company of both parents and *231 his extended paternal family, and, from what appears in the record, the child was exposed to similar educational and cultural experiences in both Schaumberg and the Birmingham area. Based on the evidence in the present case, the trial court could certainly have determined, based on the conflicting testimony, that the distance between Schaumberg and Alabama and the cost of visitation would make the father’s visitation more difficult and would negatively impact the amount of contact the father would have with the child, thus forming the basis for a conclusion that the territorial restriction is in the best interest of the child. Because the child’s best interest is served by the restriction, it is not an unconstitutional infringement on the mother’s right to travel. Everett, 660 So.2d at 601-02. Accordingly, we affirm the trial court’s judgment imposing the territorial restriction.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in the result, with writing.

. Subject to certain exceptions not applicable here, the Act applies in those situations in which the planned relocation is to a residence more than 60 miles from the child's principal place of residence, unless the move results in the child being located closer to the noncustodial parent, provided, however, that the relocation does not result in the child’s living in another state. § 30-3-162(b).

. To allow die mother's decision to leave the marital residence to impact a determination of the child's principal place of residence in this case would appear to run afoul of the Parental Kidnapping Prevention Act (“PKPA''), codified at 28 U.S.C. § 1738A, and the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA”), codified at Ala.Code 1975, § 30-3B-101 et seq. Both acts are designed to resolve disputes among the states regarding which state has jurisdiction to determine the custody of children when the parents are residing in two separate states.
Under the PKPA,
" 'home State’ means the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons. Periods of temporary absence of any of such persons are counted as part of the six-month or other period.”
28 U.S.C. § 1738A(b)(4). In order for an issuing court's child-custody determination to meet the requirements of the PKPA and be entitled to full faith and credit in the courts of its sister states, the issuing court must have jurisdiction under its own laws and:
"(2) one of the following conditions [must be] met:
"(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State.”
28 U.S.C. § 1738A(c)(2)(A).
The UCCJEA defines “home state” as:
"The state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of the child or any of the mentioned persons is part of the period.”
§ 30-3B-l02(7). Consistent with the PKPA, in the absence of special emergency circumstances, see § 30-3B-204, Alabama has jurisdiction to make an initial child-custody determination only if:
“(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this slate but a parent or person acting as a parent continues to live in this state.”
§ 30-3B-201(a)(l).