THOMAS, Judge.
B.L.M. (“the child”) was bom on September 4, 2007. M.D.B. (“the mother”) and T.M. (“the father”) were unmarried high-school students at the time the child was conceived. No one disputes that T.M. is the father of the child. In February 2008, J.D. (“the maternal grandfather”) and D.D. (“the maternal grandmother”) (hereinafter referred to collectively as “the maternal grandparents”) filed a petition in the DeKalb Juvenile Court seeking custody of the child and alleging that the child was dependent because “neither parent can financially support the child — mother is in college.” The mother and the father consented to a temporary change of custody, and the record contains a judgment dated February 21, 2008, in which the juvenile court awarded temporary custody of the child to the maternal grandparents.
The dating relationship -between the mother and the father ended in August 2008, and eventually both the mother and the father attended colleges and married other people. It is undisputed that the father visited the child infrequently after August 2008 and that the last time the father saw the child was on September 4, 2010, when the child was three years old. The father admitted that he had provided a total of less than $1,500 in support for the child.[1]
On February 7, 2013, the mother filed a petition in the juvenile court seeking the termination of the father’s parental rights, alleging that he had abandoned the child, that he had failed to support the child, and that termination of his parental rights was in the child’s best interest. In the petition the mother inaccurately labeled herself as the “legal custodian” of the child; however, in paragraph five, she accurately acknowledged that the maternal grandparents were the child’s legal custodians.
*3 The father filed an answer to the mother’s petition and a counterclaim in which he requested an order adjudicating his paternity of the child. The father also sought custody of the child and an award of child support. In his filing, the father admitted that he is the biological father of the child, but he denied that he had abandoned the child or had failed to support the child. He asserted that the maternal grandparents had interfered with his ability to visit the child and that on October 9, 2012, he had filed a petition in the juvenile court seeking an adjudication of paternity and visitation with the child; however, in the three months between the time he had received a return-of-service form indicating that the mother had not been served with his petition and the time he had received the mother’s petition seeking to terminate his parental rights he had not learned the mother’s address in order to perfect service of his petition.[2]
The father filed a motion requesting “temporary visitation” with the child pending the termination-of-parental-rights trial. The record contains an order setting a hearing on the father’s motion for June 13, 2013; however, that hearing never occurred. Instead, the juvenile court heard ore tenus testimony at the termination-of-parental-rights trial on July 30, 2013, and it entered a judgment on August 2, 2013.
The juvenile court terminated the father’s parental rights and stated that the father is “the presumed legal father of the minor child, but that no adjudication of paternity ha[d] been ordered as of the date of the filing of the Petition to Terminate Parental Rights.” The juvenile court observed that D.B., the mother’s husband (“the husband”), had a close relationship with the child and desired to adopt the child. The juvenile court awarded custody of the child to the mother, ordered that the child’s surname be changed to the mother’s maiden name, and restrained the father from having any contact with the child, the mother, or the mother’s family.
On August 13, 2013, the father filed a motion to alter, amend, or vacate the August 2, 2013, judgment or for a new trial because, according to the father, the juvenile court had lacked jurisdiction over the action because his paternity had not been established, the juvenile court had failed to consider all viable alternatives to the termination of his parental rights, and clear and convincing evidence did not support the judgment. Finally, the father requested that the juvenile-court judge recuse himself because, the father asserted, he had a “close relationship” with the mother’s aunt and had “discussed” certain facts with the mother’s aunt before the mother had filed the petition seeking to terminate his parental rights. On August 15, 2013, the father filed a notice of appeal; the appeal was held in abeyance pending a ruling on the father’s postjudgment motion. See Rule 4(a)(5), Ala. R.App. P. On August 22, 2013, the juvenile court denied the father’s postjudgment motion and the juvenile-court judge declined to recuse himself.
The father seeks this court’s review of whether the juvenile court properly exercised jurisdiction over the matter, whether his parental rights could be terminated absent findings of paternity and dependency, whether sufficient evidence supports the judgment, and whether all viable alternatives were exhausted before terminating his parental rights.

*4
Standard of Review

“In reviewing factual findings in termination-of-parental-rights judgments, this court has a narrow standard of review that allows us to disturb those findings only when they are so unsupported by the evidence as to be plainly and palpably wrong. See J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007). If a fact-finder reasonably could have been clearly convinced from the evidence in the record that a parent is unwilling or unable to discharge his or her parental responsibilities to and for the child, this court may not reverse a judgment terminating parental rights arising from ore tenus proceedings in a termination-of-parental-rights case. See J.B. v. DeKalb County Dep’t of Human Res., 12 So.3d [100] at 111 [ (Ala.Civ.App.2008) ].”
M.H. v. Jefferson Cnty. Dep’t of Human Res., 42 So.3d 1291, 1294 (Ala.Civ.App.2010).

Facts

At the time of the July 30, 2013, termination-of-parental-rights trial, the child was five years old. The father and the mother were 24 years old. The father had been married for three years and had a two-year-old daughter. The mother had been married for one year.
The parties testified that they had started dating when they were 17 years old. The mother testified that the child was conceived after the parties had been dating for “a little over a year.” The father said that they had continued to date after the child was born and that during that time he saw the child three or four times per week at the maternal grandparents’ house. He said that the mother welcomed him but that the maternal grandparents “made it tough.” The father said that, after the parties’ relationship ended in August 2008, he had visited the child “regularly” for six months. Thereafter, according to the father, the maternal grandfather started “cutting off contact” and had “let [the father] know that [the maternal grandparents were] in control and [that the father] needed to back off.”
The maternal grandmother testified that she had been less accommodating than the maternal grandfather of the father’s visits with the child. The mother said that after the parties’ relationship ended she and the maternal grandmother had not wanted to see the father, although, according to the mother, She would have “welcomed” the idea of co-parenting the child. The maternal grandfather testified that he had agreed to let the father visit the child two nights per week, at times when the mother and the maternal grandmother were not at the house. According to the mother and the maternal grandfather, the father failed to take advantage of all the visits the maternal grandfather had offered to the father. The mother said that the father had visited the child only four times between August and December 2008 and only three times in 2009.
R.B., the father’s pastor, testified that in 2009 the father had asked him for advice regarding seeking visitation with the child. He said that the father had told him that at times he was able to see the child but that most of the time he was unsuccessful. R.B. said: “And ... there [were] times that he would call to be able to go see the child and by the time he got there, the child wasn’t there.” The father specifically recalled 'visiting on September 5, 2009, on Christmas day of 2009, and on September 4, 2010. The father said that for six months in 2010 he had tried to telephone to arrange a visit but that the maternal grandparents would not accept his telephone calls. The father said that he would arrive for unexpected visits “several times *5 a month” but that no one would come to the door, although the father said that at times he had believed that the child and the maternal grandparents were inside the house. The father’s sister testified that the maternal grandparents would tell the father that he could come to the house to see the child but that, when the father arrived, no one would be there. The maternal grandparents denied that they had interfered with the father’s visits in the ways that had been described. The father indicated that he quit attempting to see the child because continually trying and failing to visit the child took an “emotional toll” on him.
The mother said that she started dating the husband in 2010 and that they married on May 12, 2012. She said that she and the child had moved out of the maternal grandparents’ house when she married the husband but that before the marriage she had taken care of the child “on [her] own” with financial help from the maternal grandparents. The maternal grandmother testified that, despite the custody orders, the mother had always been the child’s primary caregiver. She said the mother was a good mother and that the husband loved the child. The mother said that the child had called the husband “daddy” since the child was three years old.
Although it was undisputed that the father’s surname was the child’s surname, the mother said that she had made the decision to use her maiden name as the child’s surname because she did not know how to explain to the child why his surname was different than her surname; however, she later testified that the child did not “really use” a surname. She agreed that by the time the .child began kindergarten he would need to know his surname.
The father admitted that he had consented to giving custody of the child to the maternal grandparents in 2008. He said that at that time he was “unaware of what that temporary custody meant” but that he had understood that the change of custody was “temporary for insurance purposes.” The parties and the maternal grandmother agree that the custody arrangement was motivated by the child’s need for insurance; however, the details surrounding that need were disputed. The mother said that she could not provide insurance because, although she was employed, she was not a full-time employee at that time. The father, who was at that time a full-time employee, testified that the maternal grandparents had refused to provide necessary documentation, such as the child’s Social Security card, to him; thus, he said, his employer could not include the child on the father’s insurance coverage. The mother testified that the father had refused to put the child on his insurance and that he had told her that the child should be on Medicaid. The maternal grandmother testified that the father had told her that providing insurance for the child would “take too much out of [the father’s] check” and that he had, instead, purchased a motorcycle.
According to the mother, she was also motivated to consent to a change of custody because the father had tried to take the child from the maternal grandparents’ house on one occasion. B.D., the mother’s brother, testified more specifically that, on the weekend following the child’s birth, the father had become angry with the mother and had threatened to take the child in an attempt to “control” the mother. A.H., the mother’s friend, testified that the father was “very controlling” of the mother when they were in high school. The maternal grandfather testified that he had changed the mother’s telephone number because the father had sent her text messages in the early rhorning hours after the *6 parties’ relationship had ended accusing her of being dishonest and of having a sexual relationship with another man during their relationship.
The father said that he had contacted an attorney on September 14, 2012, “to go about custody” and that he could not afford to hire an attorney in 2010 and 2011; he testified that he had never earned more than $13.50 per hour. He said that he was unaware of any “other route” available to him.
The mother’s witnesses said that the husband was a good father. D.K., the mother’s and the maternal grandparents’ pastor, testified that the husband interacted with the child like a father. P.L., the mother’s employer, testified that the child and the husband have a “great relationship.”
The father testified that he would be a good father if given a chance, although he admitted that he had “made mistakes” and had not been a good father to the child. He said that he understood that he should be slowly eased into the child’s life and conceded that suddenly coming back into the child’s life would be difficult for the child, but he pointed out that he had had contact with the child until he was three years old. He said that the child was only five years old and that it would be in the child’s best interest to receive love and affection from him and his family as well as from the mother and her family.
The mother testified that the child had once seen a photograph of the father and that she had told the child she did not know who the father was. She said that introducing the father into the child’s life would “break [the child’s] heart” because, she said, the husband was the only father the child knew. When questioned about reintroducing the father into the child’s life, the maternal grandfather said: “There’s going to be pain.” The mother said that she desired the termination of the father’s parental rights because the husband wanted to adopt the child. The maternal grandparents testified that they were supportive of the husband’s intention to adopt the child and that they intended to “surrender” or “turn over” custody of the child to the mother. P.B., the husband’s mother, testified: “I am [the child]’s grandmother,” and she said that she supported the husband’s desire to adopt the child.
Thomas Whitten, a licensed social worker, testified on behalf of the mother. Whitten said that he had conducted one counseling session with the child, had talked to the mother, and had observed the child at school. He said that the child was “well adjusted all around.” He said that the child identified the husband as “dad.” Whitten testified that, as a result of being well adjusted, the child would experience emotional conflict if the father was inserted into his life because the child was unaware of his relationship to the father. Whitten agreed that the best interest of the child would be served by terminating the father’s parental rights, although he admitted that he did not know “all the factors in the case.” On cross-examination Whitten further admitted that he had never met the father and that he had had a “long-term [work] relationship” with the mother and with the maternal grandmother and that it was possible that supervised visitations and a slow introduction to a parent could be a positive experience for a child. However, Whitten testified that, in this case, because the father had been “absent by choice” and “there’s been abuse or major issues,” it was in the child’s best interest to terminate the father’s parental rights and to allow the husband to adopt *7 the child.[3]

Analysis

I. Whether the Juvenile Court Properly Exercised Jurisdiction

The father argues that, pursuant to § 12-15-114, Ala.Code 1975, a juvenile court may not exercise jurisdiction over a termination-of-parental-rights case except insofar as that action arises out of a proceeding involving an allegation that a child is dependent, delinquent, or in need of supervision and that, as a result, the juvenile court in this case lacked subject-matter jurisdiction to hear the mother’s petition to terminate his parental rights. However, the mother and the father had agreed to allow the maternal grandparents to have temporary custody of the child in response to the maternal grandparents’ February 2008 dependency petition. The mother and the father had admitted that they were unable to provide proper care and support for the child; thus, they had admitted that the child was dependent. Accordingly, this action arose out of a previous dependency proceeding and the juvenile court had continuing subject-matter jurisdiction to consider the mother’s subsequent termination-of-parental-rights petition. See M.W.H. v. R.W., 100 So.3d 603, 607 (Ala.Civ.App.2012) (explaining that a juvenile court had continuing subject-matter jurisdiction to consider a subsequent action because it had adjudicated a previous dependency action that was filed by maternal grandparents when the parent had agreed that the child was dependent); see also § 12-15-117(a), Ala.Code 1975.

II. Whether Parental Rights May be Terminated Absent a Finding of Paternity

The father does not argue that he is not the father of the child but, instead, that the juvenile court erred by failing to adjudicate paternity. However, the juvenile court’s judgment contains the explicit finding that the father is the “presumed legal father of the child.” That finding has not been challenged. Thus, we reject the premise of the father’s argument — the juvenile court determined the paternity of the child.

III.Whether the Juvenile Court Terminated the Parental Rights of the Father Without Evidence Supporting a Finding of Dependency

We also reject the premise upon which the father bases his argument regarding the necessity of a finding of dependency. The juvenile court was not required to find the child dependent, nor was the mother required to present evidence of the child’s dependency. As our supreme court explained in Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990):
“[W]hen one parent seeks to terminate the other parent’s parental rights, a ‘finding of dependency1 is not required. As stated above, if a ‘finding of dependency’ were a requisite element of proof, the following illogical result could arise: The petitioning parent, who is adequately caring for the child, would have to prove that he or she is not providing adequate care for the child and, therefore, could then be estopped from bringing such an action. We hold, therefore, that, when one parent seeks to terminate the other parent’s parental rights, a ‘finding of dependency’ is not required, and the trial court should determine whether the petitioner has met the statutory burden of proof and whether that *8 termination is in the child’s best interest, in light of the surrounding circumstances.
“The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in [Ala.Code 1975,] § 26-18-7 [amended and renumbered as § 12-15-319]. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. (As earlier discussed, if a nonparent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)”

IV. Whether Sufficient Evidence Supports the Conclusion that Grounds for Termination Exist

In this case the mother alleged two factors supporting the termination of the father’s parental rights — lack of support and abandonment. Section 12-15-319(a)(9), Ala.Code 1975, describes the lack-of-support factor as: “Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of support of the child, where the parent is able to do so.” (Emphasis added.) The father, at most, provided $1,500 toward the support of the child during the child’s lifetime.' However, we note that the father was not the child’s custodian and was never ordered to pay support. Moreover, there was no testimony indicating whether the father was' “able to” provide for the child’s material needs; the father testified that he had a family of three and had never earned more than $13.50 per hour. Thus, the juvenile court lacked clear and convincing evidence to support its conclusion that the father had failed to support the child because there was no testimony indicating that the father was able to support the child.
Regarding the abandonment factor, § 12-15-301(1), Ala.Code 1975, defines “abandonment” as:
“A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his or her presence, care, love, protection, maintenance, or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent.”
By this definition, both the mother and the father had abandoned the child by voluntarily and intentionally relinquishing the child’s custody to the maternal grandparents; however, only the father, for a period of 2 years and 10 months, withheld his presence, care, love, protection, and maintenance and failed to afford the child the opportunity to display his filial affection for the father. Furthermore, the father failed to claim the rights of a parent and perform the duties of a parent.
This court finds two opinions instructive: Ex parte L.E.O., 61 So.3d 1042 (Ala.2010), and A.E. v. M.C., 100 So.3d 587 (Ala.Civ.App.2012). Ex parte L.E.O. was a dependency case, in which the mother had permitted the child to reside for three years with the petitioners who were not related to the child. 61 So.3d at 1043. The petitioners had filed a petition seeking an award of custody of the child and a finding of dependency. Id. The child’s father lived in California and had not seen the child for more than three years; the father did not know that the child’s mother had relinquished custody of the child to the peti *9 tioners, and, according to the father, the mother had thwarted his efforts to visit the child. Id. at 1046. The juvenile court determined that the child was not dependent, and this court affirmed the juvenile court’s judgment without an opinion. See L.E.O. v. A.L., 61 So.3d 1041 (Ala.Civ.App.2009). Our supreme court reversed, explaining that the child had been abandoned and was dependent.
“[A]t the time the petitioners sought custody of the child and a finding of dependency, the child had been abandoned by both persons legally obligated to care for and/or to supervise him. The mother had allowed the petitioners to assume physical custody of the child and thereafter assumed no responsibility for his care or supervision. The father had not seen the child or provided any financial support for a period of over three years. The child was, therefore, dependent as that term is defined by § 12-15-1(10), Ala.Code 1975.”
Ex parte L.E.O., 61 So.Sd at 1050.
AJE. v. M.C. was also a dependency case. 100 So.3d at 587. In A.E. the child’s father had filed a petition seeking custody of the child more than four years after the death of the child’s mother. Id. at 594. During that time, the child’s maternal grandmother had custody of the child, but, with the maternal grandmother’s permission, the child had lived with the maternal aunt and uncle. Id. at 589. The maternal aunt and uncle filed a petition for custody of the child alleging that the child was dependent. Id. at 590. The juvenile court concluded that the child was not dependent. Id. at 589. The maternal aunt and uncle argued on appeal that the child was dependent because, “in the four years after the mother’s death, the father had abandoned the child and had left her to be raised by others.” Id. at 596. We relied on our supreme court’s decision in Ex parte L.E.O. and concluded that the child was dependent because the child had been abandoned. Id. at 596. Therefore, we reversed the juvenile court’s judgment and remanded the cause for further proceedings. Id. at 599.
Although this case is a termination-of-parental-rights case, in almost every other respect it is indistinguishable from Ex parte L.E.O. and A.E. The father sought custody of the child after he had not visited the child for 2 years and 10 months. During that time, the maternal grandparents had custody of the child, but, with the maternal grandparents’ permission, the child had lived with the mother and the husband. We must conclude that, based upon our supreme court’s conclusion in Ex parte L.E.O. and opr conclusion in A.E., the juvenile court properly determined that the father had abandoned the child. Thus, of the 12 or more factors supporting the termination of parental rights found in § 12-15-319, the juvenile court’s termination of the father’s parental rights rests upon' the single factor of abandonment. We conclude that the juvenile court’s judgment terminatihg the father’s parental rights is supported by its finding that the father had abandoned the child for a period of 2 years and 10 months.

V. Whether the Juvenile Court Failed to Explore All Viable Alternatives Before Terminating the Father’s Parental Rights

“The two-prong test that a court must apply in a parental rights termi-' nation case brought by a custodial parent [4] consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, *10 those- specifically set forth in [Ala.Code 1975,] § 26-18-7 [amended and renumbered as § 12-15-319], Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered.”
Ex parte Beasley, 564 So.2d at 954.
Having already determined that the first prong has been satisfied, we now turn to the father’s further contention that the juvenile failed to consider the implementation of gradual visitation with the child as a viable alternative to the termination of his parental rights. The mother and her witnesses offered testimony in opposition to the grant of visitation, saying that visitation would cause the child to experience pain, a broken heart, and emotional conflict because he has no knowledge of his biological relationship to the father and believes that the husband is his father.
The evidence was sufficient to support the juvenile court’s finding that no viable alternative to the termination of the father’s parental rights existed. T.V. v. B.S., 7 So.3d 346, 353 (Ala.Civ.App.2008)(collecting cases rejecting a viable-alternative argument after an individual’s prolonged absence from a child’s life).
“It is well settled that the paramount concern in proceedings to terminate parental rights is the best interest of the child. See Ex parte J.R., 896 So.2d 416, 423 (Ala.2004); A.A. v. Cleburne County Dep’t of Human Res., 912 So.2d 261, 264 (Ala.Civ.App.2005). ‘The trial court, as opposed to a reviewing court, is in the best position to evaluate the circumstances of each case and to determine the best interests of the [child].’ A.R.E. v. E.S.W., 702 So.2d 138, 141 (Ala.Civ.App.1997). Likewise, the trial court is in the best position to resolve conflicts in evidence offered by the parties at the final hearing. See D.M. v. Walker County Dep’t of Human Res., 919 So.2d 1197, 1214 (Ala.Civ.App.2005) (quoting Ethridge v. Wright, 688 So.2d 818, 820 (Ala.Civ.App.1996)) (“ ‘The trial court, as the finder of fact, is required to resolve conflicts in the evidence.’ ”).”
R.S. v. R.G., 995 So.2d 893, 903 (Ala.Civ.App.2008). Thus, we are satisfied that potential viable alternatives to a termination of- parental rights were presented to, considered by, and rejected by the juvenile court.

Conclusion

The judgment of the juvenile court is affirmed because the juvenile court properly exercised jurisdiction over the matter, the juvenile court determined the child’s paternity, the juvenile court was not required to make a finding of dependency, sufficient evidence of abandonment exists, and the juvenile court considered all potential viable alternatives before terminating the father’s parental rights.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and DONALDSON, JJ., concur.
MOORE, J., concurs in the result, without writing.

. The mother said that the father had never provided money but that he had purchased formula and diapers for the child one time.

. Apparently the father had attempted service upon the mother at a house once belonging to the parents of D.B., the mother’s husband. That house had been destroyed by a tornado in 2011, and D.B.’s parents had relocated. The house had not been rebuilt.

. The testimony regarding the father’s ‘‘controlling" nature and the father's purportedly harassing text messages is the only evidence in the record regarding the father's alleged "abuse” or “harassment” of the mother. The record does not include any evidence indicating that the father had abused, assaulted, or injured the mother or the child.

. We have not overlooked the fact that the maternal grandparents were the custodians of the child; however, with their permission, the mother was acting as the custodial parent.