REL: 07/03/2014

Notice: This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

### 1130811

_____

**Ex parte T.M.**

**PETITION FOR WRIT OF CERTIORARI
TO THE COURT OF CIVIL APPEALS**

**(In re: T.M.**

**v.**

**M.D.)**

**(DeKalb Juvenile Court, JU-08-117.02;
Court of Civil Appeals, 2121005)**

WISE, Justice.

WRIT DENIED. NO OPINION.

1130811

Stuart, Bolin, Parker, Murdock, Shaw, Main, and Bryan, JJ., concur.

Moore, C.J., dissents.

1130811

MOORE, Chief Justice (dissenting).

This petition raises important questions about the propriety of terminating the parental rights of a natural father, T.M., to satisfy the desire of the mother's new husband to adopt the father's child as his own. The natural father poses no danger to the welfare of his child, whose only supposed benefit from the termination of his father's parental rights is that the child will be spared from learning of his true paternity until many years in the future.

Because I believe that the Court of Civil Appeals seriously erred in affirming the termination of T.M.'s parental rights, I respectfully dissent from the denial of T.M.'s petition for a writ of certiorari.

## I. Facts and Procedural History

T.M. ("the father") and M.D. ("the mother") began dating in high school when they were 17 years old. During their senior year, the mother, who was living with her parents, became pregnant. The father and the mother concealed the pregnancy from everyone, including the mother's parents, who learned one night in September 2007 that the mother needed to go to the hospital to give birth. In February 2008, the couple

3

consented to transferring temporary legal custody of the child to the mother's parents. The mother continued to live with her parents and cared for the child with her parents' help.

A year after the child's birth, the couple broke up. Although the father had visited the child regularly up to that point, his visits after the breakup became sporadic. The last time he saw the child before the termination hearing in July 2013 was on his son's third birthday in September 2010. He claims that his visits ceased because the mother and her parents deliberately avoided him and he eventually gave up trying to see the child. The father's sister provided some corroboration of this testimony, but the mother and her parents denied that they had avoided the father. The father's pastor testified that the father came to him in 2009 and asked for help in getting to see his son. The father testified that he hired a lawyer in the fall of 2012 to seek visitation but that he was unable to effect service on the mother.

In 2010, the father married and started a family. He has a daughter who is now three years old. In May 2012, the mother married and moved from her parents' home to live with her husband and the child, who calls the husband "Daddy." The

4

father would like his son to know that he is the father and is willing to have a gradual structured reintroduction to his son that would not be disorienting to the child. The mother claims that simply knowing about the father would be emotionally stressful for the child.

In February 2013, in order to facilitate a stepparent adoption of the child by her husband, the mother moved the juvenile court to terminate the father's parental rights. The father counterclaimed for an order declaring paternity and for custody. He also sought temporary visitation.

The juvenile court heard testimony from 10 witnesses. Finding that the father had abandoned his son, a statutory ground for the termination of parental rights, § 12-15-319(a)(1), Ala. Code 1975, the juvenile court terminated the father's parental rights in order, it reasoned, to provide the child with "stability." The juvenile court did not discuss or analyze any viable alternatives to termination. The Court of Civil Appeals affirmed the juvenile court's ruling on the ground of abandonment and the lack of viable alternatives. T.M. v. M.D., [Ms. 2121005, April 11, 2014] ___ So. 3d ___ (Ala. Civ. App. 2014). However, the Court of Civil Appeals did

1130811

not seriously consider the alternative of maintaining the status quo and allowing the father visitation.

## II. Analysis

"[U]nder Ex parte Beasley, [564 So. 2d 950 (Ala. 1990),] upon finding that abandonment constitutes a ground for a termination of parental rights, a trial court must consider whether viable alternatives to termination exist." Ex parte J.E., 1 So. 3d 1002, 1013 (Ala. 2008) (Cobb, C.J., concurring specially). In previous cases in which a custodial parent has initiated a termination-of-parental-rights proceeding, appellate courts have been reluctant to affirm the severance of the parental bond between the child and the noncustodial parent in the absence of evidence that the noncustodial parent poses some tangible threat to the child's welfare.

> "Since [1987] this court has consistently held that termination of parental rights is not appropriate in cases like this one in which the children are safely residing with the custodial parent and the continuation of the noncustodial parent's parental rights does not present any harm to the children."

A.J.H.T. v. K.O.H., 983 So. 2d 394, 406-07 (Ala. Civ. App. 2007) (Moore, J., concurring in part and dissenting in part). See also Ex parte M.D.C., 39 So. 3d 1117, 1143 n.14 (Ala. 2009) (Murdock, J., dissenting) (noting that cases "come

6

before the appellate courts of this State in which the record suggests that an effort to terminate has occurred because of animosity or spite, out of convenience, <u>or simply to accommodate a new spouse who wishes to adopt a child</u>" (emphasis added)).[1]

In <u>Ex parte A.S.</u>, 73 So. 3d 1223 (Ala. 2011), the mother was incarcerated, and the grandmother had sole legal custody of the child. The grandmother petitioned to terminate the mother's parental rights in order to adopt the child. The trial court terminated the mother's parental rights, and the Court of Civil Appeals affirmed the termination. This Court reversed the Court of Civil Appeals' judgment, holding that "[t]he grandmother's maintaining custody of the child and having the ability to determine and supervise the mother's visitation with the child is a viable alternative to termination of the mother's parental rights ...." 73 So. 3d at

---

[1]The concept that a custodial parent may initiate the termination of the parental rights of a noncustodial parent seems inherently dubious to me. What is the purpose of terminating the parental rights of the noncustodial parent when the child is already experiencing permanency with the custodial parent? See <u>S.D.P. v. U.R.S.</u>, 18 So. 3d 936, 944 (Ala. Civ. App. 2009) (Moore, J., concurring specially) (noting that "[t]he record indicates that the continuation of the father-child relationship does not currently affect the stability and permanency of the child in any manner").

7

1130811

1229. In S.M.M. v. R.S.M., 83 So. 3d 572 (Ala. Civ. App. 2011), the father of the child, who had sole custody, sought to terminate the parental rights of the mother, who had a prison record. The trial court terminated the mother's parental rights. The Court of Civil Appeals reversed its judgment, holding that "[m]aintenance of the status quo and allowing the mother continued supervised visitation with the child adequately protects the welfare of the child while allowing for a beneficial relationship with both parents." 83 So. 3d at 577. The court specifically noted that "no evidence was offered to suggest that [the mother] posed a physical threat to the child." Id. at 576.

In this case no evidence was presented indicating that the father posed a threat of physical harm to the child. Instead, the mother predicted that the child would experience emotional conflict by knowing his father while being raised by the husband. The Court of Civil Appeals considered this testimony to be clear and convincing evidence that no viable alternative to the termination of the father's parental rights existed:

"The mother and her witnesses offered testimony in opposition to the grant of visitation, saying that

8

> visitation would cause the child to experience pain, a broken heart, and emotional conflict because he has no knowledge of his biological relationship to the father and believes that the husband is his father.
>
> "The evidence was sufficient to support the juvenile court's finding that no viable alternative to the termination of the father's parental rights existed."

T.M., ___ So. 3d at ___. The father argues that "[p]arenting time or visitation could have been awarded incrementally, gradually and even supervised if necessary." T.M.'s brief, at 7. The Court of Civil Appeals rejected as unviable the alternative of "gradual visitation with the child." T.M., ___ So. 3d at ___.

The difference between this case and those cited above in which the child was residing safely with the custodial parent and thus "continuation of the noncustodial parent's parental rights [did] not present any harm to the children," A.J.H.T., 983 So. 2d at 407, is the presence of a new substitute "Daddy," who is now married to the mother. This circumstance supposedly creates a heart-wrenching conflict for the child that can be remedied only by terminating the parental rights of the natural father. But what about the emotional impact upon the child when years later he learns the identity of his

natural father, whose existence has been deliberately concealed from him?

The mother offered the testimony of a social worker who had known the mother and the grandparents for many years and who had recently interviewed the child. When asked if it would be in the child's best interests for the father's parental rights to be terminated, he stated: "I don't know all the factors in the case, so I can't really state that at this point in time." Cutting the child off from knowledge of his natural lineage and a relationship with the father's immediate and extended family -- contact that is more likely to nurture than to harm the child -- seems intuitively detrimental to the child's sound emotional development. See Ex parte Monroe, 727 So. 2d 104 (Ala. 1999) (reinstating a trial court's judgment that awarded a change of custody for the purpose of preserving a child's ties with his extended family).

Even were the child to benefit from having his natural father erased from his life,[2] that fact would not justify

---

[2]"Termination of parental rights, by abrogating the parent's legal right to visitation, normally forecloses the child's opportunity to visit or communicate with the parent until the child reaches the age of majority." D.M. Blair, Parent-Initiated Termination of Parental Rights: The Ultimate Weapon in Matrimonial Warfare, 24 Tulsa L.J. 299, 328 (1989)

1130811

terminating the father's parental rights. The state may not terminate a parent's rights simply because a child will supposedly experience superior nurturing from an adoptive parent. "[T]hat a more ideal living situation exists for the children provides no basis for terminating the parental rights of the [father]." S.U. v. Madison Cnty. Dep't of Human Res., 91 So. 3d 716, 722 (Ala. Civ. App. 1988). "[T]he courts of this state do not have the power to sever the bonds of blood relationship merely in order to gain some real or fancied advantage for a minor child." Griggs v. Barnes, 262 Ala. 357, 362, 78 So. 2d 910, 916 (1955). A trial court, facing similar facts, stated:

> "'[T]he Court does not find that it is in the best interests of the child to terminate the parental rights of the biological father merely to delay the child's knowledge of the truth or to avoid or delay facing the same in an organized and therapeutic manner, merely to assist the stepfather in his desire to become an adoptive father.'"

K.H.M. v. D.L.I., 895 So. 2d 950, 953 (Ala. Civ. App. 2003) (quoting trial court's order and affirming the trial court's

----

(footnote omitted).

1130811

judgment, with one judge concurring and another concurring in the result).[3]

The right of a father and his son to enjoy their unique natural relationship is fundamental in our law. "The father and the child share reciprocal fundamental constitutional rights to association with one another." Meadows v. Meadows, 3 So. 3d 221, 236 (Ala. Civ. App. 2008) (Moore, J., concurring in the result). The state may sever this bond only if clear and convincing evidence exists that demonstrates the father's unfitness. "The clear and convincing evidence must demonstrate ... that the state has a compelling interest requiring interference with the rights of the parents and that that interest is being advanced by the least restrictive means." Ex parte E.R.G., 73 So. 3d 634, 645 (Ala. 2011). In the circumstances of this case, in which the child resides in a secure and nurturing environment with his mother and her husband, the state has no compelling interest in severing the natural father's parental rights. Furthermore, even if the state had an interest in protecting the child from the

_____

[3]In the context of a custody contest between a natural father and a stepfather, the law recognizes a presumption in favor of the natural parent. Ex parte D.J., 645 So. 2d 303, 305-06 (Ala. 1994).

12

potential emotional upset that might attend learning the truth about his conception, alternatives exist that are less drastic than a permanent severance of the child's filial bond with his natural father. See Franz v. United States, 707 F.2d 582, 602 (D.C. Cir. 1983) ("Severance of the filial bond ... obviously cuts deeply into the emotional interests of both parent and child ...."); Corey L. v. Martin L., 45 N.Y.2d 383, 392, 408 N.Y.S.2d 439, 443, 380 N.E.2d 266, 271 (1978) ("The filial bond is one of the strongest, yet most delicate, and most inviolable of all relationships ....").

Although "[a] juvenile court has an imperative duty to exhaust all viable alternatives before terminating a parent's parental rights," S.U., 91 So. 3d at 723, in this case the juvenile court did not consider any alternatives to termination of the father's parental rights.

> "[I]f some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights."

T.D.K. v. L.A.W., 78 So. 3d 1006, 1011 (Ala. Civ. App. 2011) (emphasis added). See also Ex parte Beasley, 564 So. 2d 950,

13

955 (Ala. 1990) (reversing the Court of Civil Appeals' affirmance of the termination of the parental rights of the noncustodial parent because the Court of Civil Appeals did not address "the issue of whether other alternatives, less drastic than termination of parental rights, were available to protect the best interests of the child").

Maintaining the status quo and allowing the father visitation on a gradually increasing basis is a viable alternative to termination of the father's parental rights. Granting the father visits with his son would preserve the child's current home environment with the mother and the husband while allowing both father and child to enjoy their unique relationship.[4] In short, "the evidence at this time does not rise to a level of being so clear and convincing as to support termination of the parental rights of the [father], such action being the last and most extreme disposition permitted by statute." East v. Meadows, 529 So. 2d 1010, 1012 (Ala. Civ. App. 1988) (emphasis added). See also Beasley, 564

---

[4]Another alternative to terminating the parental rights of the natural parent as a prelude to adoption is to recognize the stepparent as a legal custodian of the child. See Elizabeth J. Aulik, Stepparent Custody: An Alternative to Stepparent Adoption, 12 U.C. Davis L. Rev. 604 (1979).

1130811

So. 2d at 952 ("[A] court should terminate parental rights only in the most egregious of circumstances.").

### III. Conclusion

> "The first official action of this nation declared the foundation of government in these words: 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty, and the pursuit of happiness.'"

Gulf, Colo. & Santa Fe Ry. v. Ellis, 165 U.S. 150, 159-60 (1897) (quoting the Declaration of Independence ¶ 2 (1776)).[5] The Creator has also ordained natural parenthood, "and a fallible judge should disturb the relationship thus established only where circumstances compel human intervention." Ex parte Sullivan, 407 So. 2d 559, 563-64 (Ala. 1981) (emphasis added). Because such circumstances are not present in this case, I dissent from the denial of the father's petition for a writ of certiorari.

---

[5]The United States Code, "the official codification of the general and permanent laws of the United States," includes the Declaration of Independence in the section entitled "The Organic Laws of the United States of America." See Black's Law Dictionary 1274 (10th ed. 2014) (defining "organic law" as "[t]he body of laws (as in a constitution) that define and establish a government").

15